SOCIETY FOR GOOD WILL TO RE-
TARDED CHILDREN, INC., Russell
Cohen, by his natural father Milton Co-
hen, Audrey Rothstein, by her natural
mother Paula Rothstein, Donald Wil-
liam Fearing, by his natural father
George Fearing, Susan Feibusch, by her
natural father Philip Feibusch, Lisa
Gorelick, by her natural mother Leila
Gorelick, Lynn N. Schenk, by her natu-
ral mother Mildred Schenk, Henry F.
Segal, by his natural father David H.
Segal, Susan L. Meehin, by her natural
father Milton Meehin, Robert Cunning-
ham, by his natural father Charles
Cunningham, Nicholas Colacioppo, by
his natural mother Beatrice Colaciop-
po, Thomas H. Czerniewicz, by his nat-
ural father John Czerniewicz, Christo-
pher M. Verdino, by his natural father
Rudolph Verdino and Barbara L. Karp,
by her natural mother Mildred Karp,
on behalf of themselves and all those
similarly situated, Plaintiffs-Appellees-
Cross-Appellants,

v.

Mario M. CUOMO, as Governor of the
State of New York, Thomas A. Cough-
lin, III, individually and as Commis-
sioner of the Office of Mental Retarda-
tion and Developmental Disabilities,
Jennifer L. Howse, individually and as
Associate Commissioner of the Office
of Mental Retardation and Develop-
mental Disabilities and Alan R. Suther-
land, individually and as Acting Di-
rector of the Suffolk Developmental
Center, Defendants-Appellants-Cross-
Appellees.

Nos. 749, 750, Dockets 83–7621, 83–7663.

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 1984.

Decided June 13, 1984.

William J. Caplow, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Caren S. Brutten, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants-cross-appellees.

Michael S. Lottman, New York City (Murray B. Schneps, New York City, of counsel), for plaintiffs-appellees-cross-appellants.

Before MESKILL, PIERCE and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Weinstein, C.J., 572 F.Supp. 1300. It concerns the welfare of a few of the more than seven million mentally retarded individuals in this country. It also concerns the constitutional powers and constraints of federal courts that are asked to grant relief when state political branches of government are perceived as too slow in improving individual welfare. The district court painstakingly conducted a thorough trial and issued a decree which would result in vast changes in the lives of the mentally retarded individuals involved. While the changes embodied in the district court's decree may be commendable, we hold that some of those changes were requested from the wrong branch of government and some of them are beyond the court's constitutional power to order.

Mario Cuomo, the Governor of the State of New York, and his co-defendants appeal from a judgment of the district court ordering changes in the living environment and training for the mentally retarded residents of the Suffolk Developmental Center and ordering the placement of 400 Center residents into the community by 1987. Plaintiffs, a class representing Center residents, cross-appeal the decision to place only 400 residents in the community rather than all 1,209. We hold that part of the district court's order cannot be supported on federal constitutional grounds. Because the district court did not base any relief on federal statutory grounds, we vacate the order and remand for reconsideration in light of this opinion.

I

*Facts and Procedure*

The Suffolk Developmental Center (SDC), a state operated school for the men-

tally retarded on Long Island, was opened in 1965. At the time of trial, it housed 1,221 individuals. Of those individuals, 933 (seventy-seven percent) were considered profoundly retarded (IQ below 20), 147 (twelve percent) severely retarded (IQ 20 to 35), 73 (six percent) moderately retarded (IQ 36 to 51), 40 (three percent) mildly retarded (IQ 52 to 69) and the remainder either of normal intelligence or not categorized. The population at SDC had dwindled since the mid-1970s because many of the less severely retarded individuals had left the Center; as a result, SDC in 1983 housed a much greater percentage of highly retarded individuals than it did in the 1970s.

The instant action was filed on August 23, 1978. The fourteen named plaintiffs-appellees are the organization of parents of SDC residents and thirteen mentally retarded SDC residents. Defendants-appellants are the Governor of New York, two state officials in the Office of Mental Retardation and Developmental Disabilities and the Director of SDC.[1] The action was brought on behalf of the named plaintiffs and all mentally retarded individuals residing at SDC as well as most of those on SDC's rolls. It sought various forms of declaratory and injunctive relief, including (1) improvement of conditions at SDC and of the training and education provided to SDC residents, so that the residents could have "a meaningful opportunity to improve [their] condition in the least restrictive environment possible," and (2) transfer of SDC residents into community settings (community placement) and the development of community residences and support services. The district court certified the plaintiff class on May 15, 1980.

The bench trial consumed over twenty-one court days in March, April, September and October 1982. At the trial, more than

---

1. The district court deemed plaintiff's complaint amended to strike the defendants in their individual capacities. Docket Entry of February 17, 1982, J.App. at iv. Shortly thereafter, the court substituted for the named state mental health

officials their successors in office: Zygmond L. Slezak (for Thomas Coughlin), Elin M. Howe (for Jennifer Howse), and Fred A. McCormack (for Alan Sutherland). Docket Entry of March 8, 1982, J.App. at iv.

fifty witnesses were called, 300 exhibits received and 4,000 pages of transcripts recorded. The court also visited SDC three times, once in 1978 and twice shortly after the trial. Following the trial, the court ordered SDC's director, Fred McCormack, to submit a written four year plan for the improvement of SDC and the living conditions of its residents. The plan was submitted on April 22, 1983 and public hearings were held on the plan in June of that year. On August 10, 1983, the district court issued its opinion and order. It predicated its order on both the federal Constitution and New York law and declined to adjudicate any of the class' claims under various federal statutes.

The district court's order was a modified version of the plan submitted by McCormack. It mandated extensive improvements in the facilities, care and living environment at SDC, as well as the community placement of 400 SDC residents by 1987. Defendants appealed the class certification and the entire order. Plaintiffs cross-appealed the decision to place only 400 residents in the community, contending that all SDC residents should have been granted community placement.

Initially, we must review the propriety of the district court's certification of the plaintiff class. The district court has broad discretion in certifying classes and we cannot say here that it has abused its discretion. *Cf. Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 5–6, 101 S.Ct.1531, 1534, 67 L.Ed.2d 694 (1981); *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984). We thus affirm the district court on its class certification.

During the pendency of the trial and well before the district court's opinion and order, the United States Supreme Court issued its decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). *Youngberg* was the first Supreme Court decision dealing with the substantive due process rights of mentally retarded

individuals in state institutions. The district court's opinion relied heavily on its interpretation of *Youngberg*. This Court has also considered the effect of *Youngberg* in determining the substantive rights of SDC residents and how those rights may be enforced by the federal courts, and it has relied on that decision extensively in its review of the district court's opinion and order.

## II

### The District Court's Findings

#### A. Food, Shelter, Clothing and Medical Care

It cannot be disputed that SDC residents have a constitutional right to adequate food, shelter, clothing and medical care. *See Youngberg v. Romeo*, 457 U.S. at 316, 102 S.Ct. at 2458 (state conceded that involuntarily committed had above rights). Prison inmates have a constitutional right to decent and humane conditions, *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); and residents of schools for the mentally retarded, who cannot be punished as can prison inmates, have rights at least as great as those of inmates. *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2458.[2] Appellants essentially concede that SDC residents have these rights under the Due Process Clause. Br. for Appellants at 49.

With this in mind, we discuss whether SDC residents have been provided with constitutionally adequate food, shelter, clothing and medical care.

#### 1. Food

Appellees stipulated that the quality and quantity of food served at SDC was adequate. J.App. at 2240–41. The district court, however, found that SDC residents sometimes do not receive a constitutionally adequate amount of food. It so held not because the amount of food *served* was inadequate, but because it found that more

---

**2.** For this holding we are not required to decide whether patients reside at SDC "voluntarily" or "involuntarily." *See infra* Part II–B.

aggressive SDC residents grabbed the food actually served to other residents.

■ Although there is evidence that food grabbing did occur, *see* J.App. at 886 (testimony of Kathy Schwaninger), we find insufficient support for a holding that the food provided at SDC fails to meet constitutional minimums because of food grabbing. The district court has only provided two isolated examples of residents who might have been denied proper food because of the behavior of other residents. Even in those two isolated instances, which occurred seven and sixteen years before the testimony regarding the incidents, the evidence that other residents might have been to blame was highly circumstantial. We find nothing in the record to indicate that it is common for residents to receive inadequate food because of the behavior of other residents.

Nevertheless, none of the district court's order is aimed at correcting the claimed constitutional deficiencies in the food at SDC. Therefore, even though we hold that the district court's finding of fact was clearly erroneous, our holding does not affect the relief granted by the district court.

### 2. *Shelter*

■ The district court's finding that the quality of the shelter at SDC did not meet constitutional minimums was not clearly erroneous. For example, in an October 1981 survey by the state Office of Health Systems Management, the survey team found conditions of filth in residential areas of the building as well as flea and cockroach infestations. *See* J.App. at 269, 274–75 (testimony of Fred McCormack). The

survey team found more filth and insects, as well as ample evidence of rodent infestation, during its May 1982 visit. Pl. Ex. 33; J.App. at 1256–59 (testimony of Joseph Ryan). There was also evidence tending to show that rooms and medication cabinets were sometimes inordinately hot, Pl. Ex. 33, that heating sometimes did not work, J.App. at 474–77 (testimony of Fred McCormack), and that various diseases such as shigella and hepatitis had been transmitted through unsanitary conditions, J.App. at 2418–19 (testimony of Judy Walker). In short, there was sufficient evidence for the district court to conclude that problems in the living conditions at SDC were either not being corrected or were arising on a recurring basis and that these problems caused the living environment to fall below constitutional standards.[3]

### 3. *Clothing*

■ We affirm the district court's finding that the provision of clothing to SDC residents violated constitutional standards. There was testimony to the effect that clothing often was not clean or properly fitting. *See* J.App. at 891 (testimony of Kathy Schwaninger). Appellants attempt to rebut the district court's finding partly by attempting to discredit a witness who the district court obviously found credible. *See* Br. for Appellants at 22–23, 42. We must accord "great deference" to the district court on matters such as assessing the credibility of witnesses and weighing conflicting testimony, Fed.R.Civ.P. 52(a), *see, e.g., Sweeney v. Research Foundation of the State University of New York,* 711 F.2d 1179, 1185 (2d Cir.1983), and we see

---

**3.** Both parties cite *Woe v. Cuomo,* 729 F.2d 96, 106 (2d Cir.1984). In *Woe,* this Court held that accreditation by the Joint Commission on Accreditation of Hospitals (JCAH), a national organization of psychiatric and medical professionals, constitutes *prima facie* proof of the adequacy of care and treatment. *Woe,* however, only dealt with JCAH accreditation; the adequacy of JCAH procedures and standards was litigated in the lower court in that case. *See Woe v. Cuomo,* 559 F.Supp. 1158, 1162–65 (E.D.N.Y. 1983), *aff'd,* 729 F.2d 96 (2d Cir.1984). There has been virtually no litigation over the adequa-

cy of state inspection procedures in this case. Even if *Woe* were applicable here, however, that case only held that JCAH accreditation was *prima facie* proof of adequate care. Because the district court held here that adequate shelter was not being provided, it obviously accepted the testimony of plaintiffs' experts who rebutted the *prima facie* case. As a reviewing court, we cannot weigh the testimony differently and we do not conclude from the record that the district court's eventual findings of fact were clearly erroneous.

no reason to disturb that court's findings of fact. Because none of the district court's order was aimed at providing cleaner or better fitting clothing for SDC residents, our holding does not affect the relief granted.

There was also testimony tending to show that "adaptive" clothing, or clothing modified to suit a client's peculiar physique or to help him learn how to dress himself properly, was not being provided at SDC. *See* J.App. at 891–92 (testimony of Kathy Schwaninger). The failure to provide adaptive clothing may deny SDC residents an opportunity to retain basic self-care skills such as dressing and toileting themselves, which would be a separate constitutional violation. *See infra* Part II–C.

### 4. *Medical Care*

■ The district court's finding that there was inadequate medical care at SDC was clearly erroneous. The district court erred by stating that there was a constitutional violation because there were only one or two doctors on call for a 1,200 resident center, *cf. Burks v. Teasdale*, 492 F.Supp. 650, 677 (W.D.Mo.1980) (constitutionally adequate for 2,300 inmate prison to have only one doctor on call); the unrebutted testimony was that there were physicians and nurses on the SDC grounds around the clock and that SDC had contracts with area hospitals for the provision of medical services when residents became ill. J.App. at 2352–54 (testimony of Judy Walker). While there have been occasions when patients' specific medical problems

have been treated improperly, the district court's decision should not have been based on isolated instances of improper treatment, but on a finding that medical care was inadequate on a class-wide basis. Isolated instances of inadequate care, or even of malpractice, do not demonstrate a constitutional violation. *Cf. Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).

It appears, however, that no part of the district court's order is geared toward improving medical care. Therefore, the error in this finding should not affect the order.

### B. *Right to Safe Conditions and Freedom From Undue Bodily Restraint*

In *Youngberg*, the Supreme Court held that involuntarily committed residents of mental institutions have a right to safe conditions and to freedom from undue bodily restraint. 457 U.S. at 315–16, 102 S.Ct. at 2458. Here, appellants contend that SDC residents do not have these rights because, with one exception, the residents are not classified as "involuntary" and were not admitted to the Center with a court order. Br. for Appellants at 48–50.

■ We need not decide whether SDC residents are at SDC "voluntarily" or "involuntarily" because in either case they are entitled to safe conditions and freedom from undue restraint.[4] First, prior Supreme Court holdings suggest that there is a due process right to freedom from governmentally imposed undue bodily restraint for anyone at any time. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 673–74, 97

---

**4.** The district court called the residents of SDC "technically voluntary." 572 F.Supp. at 1342. It is likely, however, that if over 75 percent of SDC residents are "profoundly or severely retarded," *id.* at 1304, they are best categorized as "non-objecting residents" because they are unlikely to have sufficient understanding to recognize that they are being admitted to a school for the mentally retarded and to understand the distinction between voluntary and involuntary status or the provisions governing release. *See* N.Y. Mental Hyg. Law §§ 15.15, 15.25 (McKinney 1978). While we do not decide whether SDC residents are voluntary or involuntary, we do note that non-objecting residents have the right to be released on request (unless there is

reason to convert them to involuntary status), while involuntary residents may be retained against their will by court order. *See* N.Y. Mental Hyg. Law §§ 15.25(c), 15.33(a) (McKinney 1978). Also, the procedures for admitting and discharging "non-objecting" residents resemble similar procedures for "voluntarily" admitted minor mental patients that the Supreme Court found constitutional in *Parham v. J.R.*, 442 U.S. 584, 588 & n. 3, 606–17, 99 S.Ct. 2493, 2497 & n. 3, 2506–2511, 61 L.Ed.2d 101 (1979). *See also* N.Y.Admin.Code tit. 14, § 15.4(b)(1) (1980) (voluntarily admitted minors who were admitted by application of parent or guardian may be converted to non-objecting status when they reach 18).

S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed.1042 (1923); *see also Parham v. J.R.,* 442 U.S. 584, 601, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). Furthermore, *Youngberg's* reasoning and reliance on Supreme Court precedent also suggest that anyone in a state institution has a right to safe conditions. *See Youngberg,* 457 U.S. at 315, 102 S.Ct., at 2458 (right to safe conditions) (citing *Ingraham v. Wright,* 430 U.S. at 673, 97 S.Ct. at 1413 ("Among the historic liberties [protected by the Due Process Clause] was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.")).

Second, *Youngberg* stated that even prison inmates who are being punished by incarceration have a right to safe conditions and freedom from undue restraint. Thus, the *Youngberg* Court reasoned, involuntarily committed mental patients must have those rights because they cannot constitutionally be punished. 457 U.S. at 315–16, 102 S.Ct. at 2458. Analogously, voluntary residents of schools for the mentally retarded cannot be punished and are entitled to rights of personal freedom at least as great as those of prison inmates.

■ Appellants place great emphasis on the fact that virtually none of SDC's residents was placed at SDC by court order. We find this irrelevant. Even granting that the State of New York was not required to build schools for the mentally retarded or admit voluntary residents, once it chose to house those voluntary residents, thus making them dependent on the state, it was required to do so in a manner that would not deprive them of constitutional rights. *See Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459; *cf., e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons ... [i]t may not deny [the] benefit ... on a basis that in-

fringes his constitutionally protected interests ....").

Thus, SDC residents are entitled to safe conditions and freedom from undue bodily restraint whether they are voluntary or involuntary residents. Our analysis cannot end there, however. The controlling standard for determining whether those rights have been violated is given in *Youngberg.* There, the Supreme Court held that whether the state has provided the necessary safe conditions and freedom from undue restraint is determined by ascertaining whether " 'professional judgment in fact was exercised.' " 457 U.S. at 321, 102 S.Ct. at 2461 (quotation omitted). The constitutional norm is violated "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462. (footnote omitted).

We thus analyze whether SDC residents' rights to safe conditions and freedom from undue restraint have been violated, keeping in mind that the conditions to which SDC residents are subjected cannot deviate from the "professional judgment" standard.

### 1. *Right to Safe Conditions*

■ The district court found that SDC residents' right to safe conditions was violated. It based its findings largely on (1) insufficient supervision to prevent SDC residents from injuring themselves or being injured by others; (2) safety hazards at SDC; (3) the practice of feeding SDC residents in a supine position (which can lead to aspiration of food); and (4) diseases transmitted to SDC residents through unsanitary conditions. There is ample evidence to support each of the factual findings and we agree with the district court's conclusion. Appellants' contention that even more serious injuries occur when mentally retarded individuals remain at home or live in community settings is misplaced. The question is not what setting would be most unsafe, but whether the state must

bear responsibility for unsafe conditions in its schools. We hold that it must.

### 2. Right to Freedom From Undue Restraint

#### a. Physical Restraints

■■■■ We agree that excess locking of doors, locking of otherwise ambulatory persons into wheelchairs and failing to put on leg braces for individuals who can walk with their assistance violates SDC residents' freedom from undue restraint. We do not, however, agree with the district court's conclusion, 572 F.Supp. at 1346, that there is a liberty interest in visiting shops, restaurants and recreational facilities in the outside community. *But see Association for ·Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473, 486 (D.N.D.1982), *aff'd on other grounds*, 713 F.2d 1384 (8th Cir.1983). The "freedom from restraint" with which *Youngberg* was concerned was Nicholas Romeo's freedom from being unnecessarily shackled. We are unwilling to extend *Youngberg* to apply to situations in which the state has done nothing to place undue physical restraints on individuals; we cannot say that the state deprives an individual of a liberty interest when it fails to provide enough field trips.

#### b. Community Placement

The district court found that "[b]y failing to provide enough community placements ... the defendants have unduly restrained many residents for whom institutional life precludes the exercise of basic liberties." 572 F.Supp. at 1347. It thus ordered that 400 SDC residents be released into community settings by the year 1987.[5] We hold that the district court erred and that no SDC resident is deprived of freedom from undue restraint or of any other constitutional right merely because he or she lives at SDC. Therefore, the order of community placement was in error.

■■■ *Youngberg* in no way suggests that mere residence in a school for the mentally retarded violates constitutional rights; there were no such allegations in the case. The Supreme Court's opinion stated that liberty from undue bodily restraint "must ... survive involuntary commitment." 457 U.S. at 316, 102 S.Ct. at 2458. This implies that involuntary commitment by itself is not undue bodily restraint. Our conclusion is buttressed by *Youngberg's* statement that "decisions made by [a] professional are entitled to a presumption of correctness ... to enable institutions [such as Pennhurst]—often, unfortunately, overcrowded and understaffed—to continue to function." 457 U.S. at 324, 102 S.Ct. at 2462. This clearly implies that mere residence in an institution or school for the mentally retarded, without more, does not violate due process.

The district court's community placement order was based on the court's belief that SDC residents had a legal right to live in a setting that provided them with training, *see infra* Part II-c, while being least restrictive of their liberties. *See, e.g.*, 572 F.Supp. at 1346–47 ("[For residents who] are capable of much freer and more productive activities in small group community homes ... the Constitution mandates placement in a group home, or in some other situation in the community, where they can effectively exercise their proven ability to live independently."). It based its "least restrictive environment" analysis on the

---

**5.** The order is virtually inconsistent with the district court's findings of fact. At the time of trial, there were 1,221 SDC residents, only 271 of whom were not classified as "profoundly retarded (IQ below 20)." 572 F.Supp. at 1304. We thus question how there could be 400 SDC residents "for whom institutional life precludes the exercise of basic liberties." *Id.* at 1347. The district court's example of one such resident appears to be an exceptional circumstance, as it appears that this resident may not belong in an institution at all. *Compare id.* at 1346–47 ("Some residents, ·such as Laura Knapp, are unduly physically restrained by living in the Center.") *with, e.g.*, J.App. at 2397 (testimony of Judy Walker) ("[I]t is an awful shame that [Ms. Knapp] has been in an institution all these years."). Moreover, the district court did not identify which 400 residents (or what subclass of residents) it considered unduly restrained by mere residence at SDC.

testimony of the experts at trial and on a state law right to care and treatment. We cannot affirm the community placement order on either ground.

■■ After the district court decision, the Supreme Court issued its opinion in *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Under *Pennhurst,* appellees are barred by the Eleventh Amendment from obtaining relief in federal court based on allegations that the state or its officials have violated state law. *See also Woe v. Cuomo,* 729 F.2d at 102. Thus, any relief granted to plaintiffs in this action must be based on either federal statutes or the federal Constitution. Because the district court refrained from basing its ruling on federal statutes, we may consider only whether there is an entitlement to community placement or a "least restrictive environment" under the federal Constitution. We hold that there is no such entitlement.

■■ *Youngberg* held that due process is satisfied if restraints are imposed on mentally retarded individuals in accordance with the judgment of qualified professionals and that courts should defer to this professional judgment. 457 U.S. at 324, 102 S.Ct. at 2462. The district court erred in assuming that the *Youngberg* professional judgment standard is not met if experts at trial disagree with care or treatment decisions that were actually made, or think another course of conduct would have been better:

> All experts, both defendants' and plaintiffs', agreed that many clients of the Center could be safer, happier and more productive outside the institution in small community residences. Their professional judgment was that transfers should be made as soon as the facilities could be made available .... The Constitution mandates community placement for those who have been adjudged by qualified professionals to require a community setting ....

572 F.Supp. at 1347.

*Youngberg* expressly stated that federal courts should not engage in this type of analysis. First, "professional judgment" has nothing to do with what course of action would make patients "safer, happier and more productive." Rather, it is a standard that determines whether a particular decision has substantially met professionally accepted minimum standards. *See Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462 ("[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from *accepted professional judgment, practice, or standards* as to demonstrate that the person responsible actually did not base the decision on such a judgment.") (emphasis added). Expert testimony is thus relevant not because of the experts' own opinions—which are likely to diverge widely—but because that testimony may shed light on what constitutes minimally accepted standards across the profession. *See Youngberg,* 457 U.S. at 323 n. 31, 102 S.Ct. at 2462 n. 31 (expert testimony "may be relevant to whether [institutional] decisions were a substantial departure from the requisite professional judgment"). While a court must ascertain what the professional standard is, it must also remember that the ultimate issue is whether patients' basic liberty interests are being safeguarded, not whether the optimal course of treatment as determined by some experts is being followed.

Second, *Youngberg* did not hold that constitutional norms are to be determined by the "professional judgment" of experts at trial. Rather, it held that constitutional standards are met when the professional who made a decision exercised "professional judgment" at the time the decision was made. The role of the experts is only to assist the court in ascertaining what the minimum professional standard is; the ultimate question is whether " 'professional judgment *in fact* was exercised.' " 457 U.S. at 321, 102 S.Ct. at 2461 (quotation omitted) (emphasis added). Even if every expert testifying at trial agrees that another type of treatment or residence setting

might be better, the federal courts may only decide whether the treatment or residence setting that actually was selected was a "substantial departure" from prevailing standards of practice. *Id.* at 323, 102 S.Ct. at 2462. *See id.* at 321, 102 S.Ct. at 2461 ("[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made"). *See also Woe v. Cuomo,* 729 F.2d at 105 ("The question suggested by *Youngberg,* then, is not what treatment was actually provided, but whether the treatment decision was professionally made and falls within the scope of professional acceptability.") (footnote omitted).

Therefore, we may not look to whether the trial testimony established the superiority of a "least restrictive environment" in general or of community placement in particular. Instead, we may rule only on whether a decision to keep residents at SDC is a rational decision based on professional judgment. Experts appear to disagree on the appropriateness of institutionalization and we cannot say that it is professionally unacceptable. *See, e.g.,* J.App. at 2048–50, 2082–83 (testimony of Dr. Hugh Sage). Thus, we hold that retaining residents at SDC is not "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462, and thus that it satisfies minimum professional standards. *Accord Phillips v. Thompson,* 715 F.2d 365, 368 (7th Cir.1983) (where state denied community placement to mentally retarded individuals and instead placed them in state institution, decision was effectuated pursuant to professional judgment and did not violate due process right to liberty of movement).

 Our conclusion that there is no constitutional right to community placement is supported by other courts. *See Phillips v. Thompson,* 715 F.2d at 368 (no denial of liberty of movement to deny community placement to several hundred higher functioning mentally retarded adults and

to place those individuals in institutions; post-*Youngberg* decision); *Garrity v. Gallen,* 522 F.Supp. 171, 237–39 (D.N.H.1981) (pre-*Youngberg* decision not based on professional judgment standard). More generally, post-*Youngberg* courts have held that there is no constitutional right to a "least restrictive environment." *See Rennie v. Klein,* 720 F.2d 266, 269, 271 (3d Cir.1983) (en banc) (plurality and concurring opinions); *Johnson v. Brelje,* 701 F.2d 1201, 1210 (7th Cir.1983); *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 486 (D.N.D.1982), *aff'd on other grounds,* 713 F.2d 1384 (8th Cir. 1983). *Cf. Sanchez v. New Mexico,* 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970), *dismissing for want of a substantial federal question State v. Sanchez,* 80 N.M. 438, 441, 457 P.2d 370 (1969) (appellant's argument that institutionalization of mentally ill persons was unconstitutional because it deprived mentally retarded individuals of personal liberties rejected by New Mexico Supreme Court).

## C. *Right to Training*

The majority opinion in *Youngberg* concluded that involuntarily committed mentally retarded individuals have a due process right to "such training as may be reasonable in light of [their] liberty interests in safety and freedom from unreasonable restraints." 457 U.S. at 322, 102 S.Ct. at 2462. This is "such training as an appropriate professional would consider reasonable to ensure [their] safety and to facilitate [their] ability to function free from bodily restraints." *Id.* at 324, 102 S.Ct. at 2462. Thus, the *Youngberg* majority implied that training rights only existed to safeguard other rights.

The *Youngberg* majority, however, declined to rule on whether involuntarily committed mentally retarded individuals had a constitutional right to any more training than was necessary to secure freedom from undue restraint and the right to safe conditions, because plaintiff Romeo had abandoned any such claims to training. 457 U.S. at 318 & n. 23, 102 S.Ct. at 2459 &

n. 23. Justice Blackmun's concurrence, joined by Justices Brennan and O'Connor, suggested that the state may be required to provide training necessary to *preserve* basic self-care skills (such as dressing and toileting oneself) that an individual possessed when he or she entered a facility for the mentally retarded. 457 U.S. at 327–29, 102 S.Ct. at 2464–65 (Blackmun, J., concurring). The concurrence, however, acknowledged that the question was "unresolved." *Id.* at 325, 102 S.Ct. at 2463. Chief Justice Burger, concurring alone, would have held that there was no constitutional right to any sort of training. *Id.* at 329–30, 102 S.Ct. at 2465. *See also O'Connor v. Donaldson,* 422 U.S. 563, 580–89, 95 S.Ct. 2486, 2496–2500, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring).

■■■■ We agree with the result suggested by Justice Blackmun's concurrence, that an individual has a due process right to training sufficient to prevent basic self-care skills from deteriorating. As *Youngberg* itself reasoned, residents of state schools for the mentally retarded cannot be punished and are therefore entitled to have their liberty interests protected at least as well as are prison inmates. Prison inmates are protected by the Eighth Amendment proscription against cruel and unusual punishment, a provision which is designed to protect civilized standards of humanity and decency. *See Estelle v. Gamble,* 429 U.S. at 102, 97 S.Ct. at 290. Just as prison officials cannot deprive inmates of a humane and decent existence, so SDC officials, who presumably know what skills each SDC resident has and whether he or she is in constant danger of losing them, cannot deprive the mentally retarded residents of their liberty interest in a humane and decent existence. We conclude that such deprivation exists when institution officials fail to exercise professional judgment in devising programs that seek to allow patients to live as humanely and decently as when they entered the school, *i.e.,* when there is no individually oriented, pro-fessionally devised program to help SDC residents maintain the fundamental self-care skills with which they entered the Center. *Cf. Youngberg,* 457 U.S. at 327, 102 S.Ct. at 2464 (Blackmun, *J.,* concurring) (self-care is "as much liberty as [many retarded individuals] ever will know").

Furthermore, we hold that SDC residents are entitled to such training whether they are "voluntary" or "involuntary" residents. The right to training exists in order to safeguard basic liberty interests. As discussed in Part II–B above, SDC residents are entitled to have their basic liberty interests protected irrespective of their classification.

■■■■ Our holding, however, does not include a right to such training as will improve a resident's basic self-care skills beyond those with which he or she entered SDC and does not encompass skills that are not basic to self-care. We do not find a due process right to a specific type of treatment or training beyond that geared toward safeguarding basic liberty interests. The Due Process Clause only forbids *deprivations* of liberty without due process of law. Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant. Because the district court declined to issue any rulings on federal statutory grounds, federal statutory rulings are unwarranted on appellate review. Therefore, we may not find that federal statutes mandate any particular type of treatment. Moreover, even if state law requires some particular type of treatment, we are precluded from determining that the treatment actually given does not live up to state standards. *See Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *See also Woe v. Cuomo,* 729 F.2d at 102.[6]

---

**6.** We are mindful that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jack-*

■ The district court made the following findings of fact with regard to the type of training afforded SDC residents:

The record contained numerous examples of precisely the sort of *regression* condemned in Justice Blackmun's concurring opinion. Loss of skills was caused by programming and other deficiencies.... The record proves that while at the Center many clients have *developed* harmful or inappropriate habits (such as head-banging, feces eating, eye-gouging, and biting) .... The Center lacks resources to deal adequately with these and other inappropriate behaviors.

572 F.Supp. at 1348 (emphasis added). While there may have been programs designed to deal with such behavior, *see* Br. for Appellant at 37–40, these programs could rationally be found to have been inadequate in quantity or quality, or unspecific and not geared toward individual clients' needs. *See, e.g.,* 572 F.Supp. at 1320–21, 1348; J.App. at 786–87 (testimony of Kathy Schwaninger). Based on our holding above and the district court's findings of fact, we agree that constitutionally adequate training was not being provided to SDC residents.

### III

### *The District Court's Order*

A. *Community Placement*

■ We have held that SDC residents are not unduly restrained by residing at SDC. Because of this, the portion of the district court's decree ordering the community placement of 400 SDC residents by 1987 must be vacated. Injunctive relief

should be narrowly tailored to fit the specific legal violations adjudged. *See, e.g., Hartford-Empire Co. v. United States,* 323 U.S. 386, 409–10, 65 S.Ct. 373, 385, 89 L.Ed. 322 (1945); *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia,* 442 F.2d 1261, 1267 (4th Cir.) (injunction "should be tailored to restrain no more than what is reasonably required to accomplish its ends"), *cert. denied,* 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971). Here, the district court should not have imposed on appellants the burden of making community placements when the failure to do so has not been determined to violate any constitutional provisions. *See also Youngberg,* 457 U.S. at 319 n. 25, 102 S.Ct. at 2460 ("A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.").

The community placement order also cannot be justified as a remedy to correct the unconstitutional conditions found at SDC. While a court order that individuals in state facilities be released may be an appropriate remedy when overcrowding is the constitutional violation, *see, e.g., Benjamin v. Malcolm,* 495 F.Supp. 1357 (S.D.N.Y.1980), there has been no showing that the constitutional violations at SDC were the specific result of constitutionally impermissible overcrowding. Appellants have not yet been subject to any court orders regarding conditions at SDC; they should first be given a chance to comply with an order geared toward remedying specific constitutional violations before anything more drastic is tried.

son v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). But even though SDC residents are to be provided with "care and treatment," N.Y. Mental Hyg. Law § 33.03(a) (McKinney 1978), this does not mean that SDC residents have a constitutional right to treatment that will cure or even improve their condition. The Supreme Court appears to have accepted that the training given to a mentally retarded individual is his or her "treatment." See Youngberg, 457 U.S. at 309 n. 1, 311 n. 5, 313 n. 12, 319, 102 S.Ct. at 2454 n. 1, 2455 n. 5, 2456 n. 12, 2460. We agree, and hold that the only constitutional right of "treatment" to which

SDC residents are entitled is that which we have held is the constitutionally mandated minimum level of training. When we also consider that patients are placed at SDC by their relatives as a last resort because the relatives cannot take care of them, see 572 F.Supp. at 1343, we cannot find that there is any due process expectation of treatment designed to cure or improve mental retardation. See Youngberg, 457 U.S. at 320–21 n. 27, 102 S.Ct. at 2460 n. 27 (this factor distinguishes cases such as the one at bar from Jackson, a procedural due process case). See also Youngberg, 457 U.S. at 330 n. *, 102 S.Ct. at 2466 n. * (Burger, C.J., concurring).

## B. *Other Portions of the Order*

 Because the district court issued its opinion before the Supreme Court's decision in *Pennhurst*, it did not specify which portions of its decree were based on state law and which on the federal Constitution, although it did explicitly decline to rule on federal statutory grounds. Some portions of the order cannot be supported on federal constitutional grounds. For example, the federal Constitution does not mandate twelve month schooling for mentally retarded individuals. Also, nothing in the federal Constitution would require stipends to twelve families "which would cost less than the equivalent of 1.78 staff per client." 572 F.Supp. at 1363. And the portion of the order requiring a 1.78 to 1 staffing ratio appears geared toward state law considerations. *See* 572 F.Supp. at 1311, J.App. at 503 (testimony of Edward Jennings) (1.78 to 1 ratio is "adequate to obtain minimal opportunity to reach a six-hour programming for the clients"); 572 F.Supp. at 1319 (New York law requires six hours of formal programming per day). Because the district court's remedy should have been narrowly tailored to remedying constitutional violations, these portions of the order and all other portions not based on the federal Constitution must be vacated.

Most of the order may at least arguably be supported by the federal Constitution. However, because the district court could not have known about *Pennhurst,* which was decided over five months after its order in this case, it did not specify which portions of the order were tailored to remedying federal constitutional violations and which were geared toward state law violations. On remand, the district court may again order any remedy, including those which were part of the original order and have not been vacated by this Court, that is intended to cure constitutional deficiencies. Because a future reviewing court may not find the constitutional basis of every remedy self-evident, the district court should specify which protected liberty interest is implicated in each portion of a subsequent order. Finally, because the district court refrained from deciding federal statutory questions, it may on remand consider the appropriateness of any form of relief, including community placement, under any federal statutory provision specified in the complaint.

We vacate the district court's order and remand for further consideration in light of this opinion.