Albert BARNA, et al.

v.

Michael HOGAN, et al.

No. 292cv649(JBA).

United States District Court, D. Connecticut.

March 31, 1997.

---

LaPointe, James T. Miller, David Neal, James L. Payne, Alan Salzman, William Jerold Warren, Thomas C. Wilkes, Terrance R. Jacob, Michael Jesensky, Charles St. Pierre.

Maite Barainca, Attorney General's Office, Health & Human Services, Hartford, CT, for Michael Hogan.

Thomas J. Ring, Attorney General's Office, Health & Human Services, Hartford, CT, for Carl Cappiello, Garrell S. Mullaney, Dennis Angelini.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [DOC. # 60]

ARTERTON, District Judge.

Plaintiffs are insanity acquitees committed to the custody of the Connecticut Psychiatric Security Review Board ("PSRB"). Defendants are the Commissioner of the Connecticut Department of Mental Health ("CDMH"), and the Superintendents of the various CDMH facilities in which plaintiffs were confined.[1]

Prior to July 28, 1989, plaintiffs had all enjoyed various degrees of physical liberty and freedom of movement, including off-grounds privileges such as day employment, shopping and theater trips, as part of individual treatment plans devised and approved by mental health professionals at their facilities. However, on July 28, 1989, David Peterson, a patient at Connecticut Valley Hospital committed to the jurisdiction of the PSRB, left the hospital grounds without authorization, following which he stabbed and killed a young child in the downtown area of Middletown, Connecticut. On August 2, 1989, a second PSRB patient escaped from Connecticut Valley Hospital.

Following the escapes, on August 3, 1989, Commissioner Hogan notified the superintendents of Connecticut Valley Hospital, Norwich Hospital, and the acting head of Fairfield Hospital that, effective immediately, all PSRB patients were to be placed on, and

Diane Polan, Williams, Polan and Pattis, New Haven, CT, for Albert Barna, Edward

---

1. In light of plaintiffs' concession at oral argument that no plaintiff was confined at Whiting Forensic Institute during the relevant time period alleged in the Amended Complaint, defendant Dr. Robert T.M. Phillips, Director of Whiting, is entitled to judgment as a matter of law.

restricted to, secure wards until comprehensive, individual clinical reviews had been completed, and determinations made on a case-by-case basis, that a particular level of privilege was appropriate. The ultimate decision as to when, and at what level, privileges were to be granted to PSRB patients was left to the discretion of the institutions' respective Medical Directors, who have not been named as defendants.

Plaintiffs allege that termination of their off-ward privileges, provided as part of their individualized treatment plans, violated their substantive due process rights to treatment. Plaintiffs also allege that their procedural due process rights were violated by failure to afford plaintiffs any procedural protections either before or after they were restricted to secure wards. Defendants move for summary judgment on the ground that they are qualifiedly immune from individual liability and from plaintiffs' request for damages on those claims.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Walentas v. Lipper*, 862 F.2d 414, 421 (2d Cir.1988). Thus, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987).

In a prior ruling dismissing plaintiffs' claims of equal protection, cruel and unusual punishment, false imprisonment and intentional and negligent infliction of emotional distress, Judge Alan H. Nevas concluded that the Commissioner's order was of a temporary or "interim" nature, and was promulgated in response to "extraordinary" stress and concern surrounding the state hospital system. Remaining is plaintiffs' claim that the Commissioner's order itself deprived

them of a constitutionally protected, substantive due process liberty interest in the treatment afforded them by their individualized treatment plans, and an alleged concomitant procedural due process deprivation.

At oral argument, plaintiffs conceded that defendants were faced with an emergency situation on August 3, 1989. Plaintiffs, however, take issue with the temporary nature of the Commissioner's order, arguing that it was not temporary by its terms, but actually resulted in an unconstitutional suspension of two to three months of the levels of freedom plaintiffs enjoyed prior to August 3, 1989, which they claim were integral to their individualized treatment plans. Thus, the gravamen of plaintiffs' claims appears to be that in issuing and adopting the order, these defendants violated plaintiffs' substantive due process right to treatment in accordance with their individualized treatment plans, which treatment encompassed off-ward privileges and trips away from the institution. Plaintiffs also advance the argument that because their evaluations indicated that they were not dangerous, defendants' continuation of their lock-down status for two to three months could not be based on any professional judgment to which the Court must defer, but instead rises to the level of a constitutional violation.

## SUBSTANTIVE DUE PROCESS RIGHT TO TREATMENT

Defendants argue that under *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), plaintiffs have no clearly established due process right to the individualized, rehabilitative treatment of which they allege they were deprived, including any concomitant off-ward and trip privileges. In *Youngberg*, the United States Supreme Court held that individuals involuntarily committed to a State Institution enjoy constitutionally protected liberty interests in conditions of reasonable care and safety, and freedom from undue bodily restraint and are entitled to such training as may be required to ensure their safety, and facilitate their ability to function free of restraints. *Id.*

The Second Circuit has rejected the claim that a due process right exists for a specific

type of treatment. In *Society for Good Will to Retarded Children, Inc. v. Cuomo ("Society")*, 737 F.2d 1239, 1250 (2d Cir.1984), the Second Circuit held that "[w]e do not find a due process right to a specific type of treatment or training beyond that geared toward safeguarding basic liberty interests," and that "the only constitutional right to 'treatment' to which [state institution] residents are entitled is that which we have held is the constitutionally mandated minimum level of training." *Id.* Thus, the *Society* court based its conclusion on the *Youngberg* pronouncement that the right to treatment or training exists only in order to safeguard the basic liberty interests of reasonable care and safety, and freedom from undue bodily restraint. *Id.* The Second Circuit reasoned that the state deprives an individual of nothing guaranteed by the due process clause if it does not provide treatment designed to rehabilitate that individual or improve his or her condition, rather, it merely declines to grant a benefit of optimal treatment that it is under no constitutional obligation to provide. *Id.*

Significantly, the Second Circuit explicitly rejected claims similar to those of plaintiffs here, holding that plaintiffs had no substantive due process liberty interest in activities outside a facility. The *Society* court concluded:

> We agree that excess locking of doors, locking of otherwise ambulatory persons into wheelchairs and failing to put on leg braces for individuals who can walk with their assistance violates SDC residents' freedom from undue restraint. We do not however, agree with the district court's conclusion, [citation omitted] that there is a liberty interest in visiting shops, restaurants and recreational facilities in the outside community.... The 'freedom from restraint' with which *Youngberg* was concerned was Nicholas Romeo's freedom from being unnecessarily shackled. We are unwilling to extend *Youngberg* to apply to situations in which the state has done nothing to place undue physical restraints on individuals; we cannot say that the state deprives an individual of a liberty

interest when it fails to provide good enough field trips.

737 F.2d at 1247.

Furthermore, with regard to plaintiffs' substantive due process liberty interests in off-ward privileges, the Second Circuit has addressed:

> whether there is an entitlement to community placement or a 'least restrictive environment' under the federal Constitution. We hold that there is no such entitlement.

*Id.* at 1248. Additionally, the Second Circuit noted that "post-*Youngberg* courts have held that there is no constitutional right to a 'least restrictive environment.'" *Id.* at 1249 (citing authority). *See also P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir.1990) ("The Constitution does not guarantee a mentally retarded person the right to live in the community of his choice or in the least restrictive environment.").

 In light of *Youngberg* and *Society*, which hold that no due process right exists to a specific type of rehabilitative treatment beyond that ensuring the basic liberty interests of reasonable care and safety, and freedom from undue bodily restraint, the Court concludes that plaintiffs' alleged deprivations do not implicate a violation of the circumscribed constitutional right to treatment recognized at the time of the challenged actions. Thus, in the absence of a showing that these defendants violated any clearly established right of plaintiffs, their actions must be deemed objectively reasonable, entitling them to qualified immunity.

### ABSENCE OF PROFESSIONAL JUDGMENT

 Alternatively, plaintiffs claim that because their evaluations indicated they were non-dangerous, defendants' continuation of their lock-down status for two to three months was not based on professional judgment, but instead rose to the level of a constitutional violation. Plaintiffs' claim fails, however, in light of the deficiencies in their submission in opposition to defendants' summary judgment motion to rebut the presumption of correctness afforded to defen-

dants' professional judgment regarding treatment decisions.

In determining whether a state has met its obligations under *Youngberg*, courts must balance the limited individual liberty interests in treatment, against the State's asserted reasons for restraining individual liberty, according a presumption of correctness to the decisions of appropriate professionals. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462–63; *Buthy v. Commissioner of the Office of Mental Health of New York State*, 818 F.2d 1046, 1050 (2d Cir.1987). The constitutional norm is violated only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards so as to demonstrate that the person responsible actually did not base the decision on such a judgment. 457 U.S. at 323, 102 S.Ct. at 2462.

The *Youngberg* court recognized that this presumption is necessary to enable institutions of this type to continue to function, and noted that because a single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day, that professional should not be required to make each decision in the shadow of an action for damages. *Youngberg*, 457 U.S. at 324–25, 102 S.Ct. at 2462–63.

Plaintiffs fail to demonstrate by affirmative evidence that defendants' continuation of their lock-down status for two to three months could not be based on professional judgment, and instead rely on their allegation that because their evaluations in August, 1989 indicated that they were not dangerous, defendants' failure to release them from the secure ward for two to three months was a substantial departure from professional practice. Plaintiffs submit no affidavits from medical professionals evidencing any view that the Commissioner's order was a substantial departure from any professionally accepted response to the type of emergency situation faced by defendants, or that the two to three month delay in restoring plaintiffs' privileges was outside acceptable professional decision-making, in light of all the circumstances.

Indeed, only plaintiffs Barna, LaPointe and Wilkes submit any evidence in opposition. They submit their own affidavits and their medical progress notes in support of their contention that the evaluation and restoration of freedoms were substantially and unreasonably delayed. Plaintiffs Miller, Neal, Payne, Salzman, Warren, Jacob, Jesensky, St. Pierre and Dyous submit absolutely no factual support whatsoever for their contentions that they were unconstitutionally deprived of any substantive due process right to treatment as a result of the alleged delay, thus entitling defendants to judgment as a matter of law by application of the qualified immunity doctrine as to this latter group of plaintiffs.

Further, only LaPointe's and Wilkes' progress notes reflect that they were evaluated as not dangerous subsequent to the August 3, 1989 order.[2] While LaPointe's clinical notes of August 17, 1989 appear to state that he "does not present any danger to self," and Wilkes' clinical notes of August 17, 1989 appear to state that he "does not pose a danger to self or others, he will be able to [illegible] room privileges for [illegible] lunch as planned," this is the extent of these plaintiffs' factual showing on the issue of the delay.

Viewing the factual record most favorably to plaintiffs, in balancing plaintiffs' limited constitutionally protected liberty interests in treatment against the emergency circumstances facing defendants, the Court concludes that plaintiffs' allegations of deprivation of their privileges under their treatment plans, and delay in restoring them, have not been shown to rise to the level of a constitutional violation. Nor have plaintiffs demonstrated that defendants' revocation of plaintiffs' privileges, and claimed delay in reinstating them, however

---

**2.** Barna's progress notes reflect only an August 2, 1989 evaluation prior to the reinstatement of his community visitation privileges on October 13, 1989. Although it is difficult to determine the relevance of an evaluation made one day prior to issuance of Hogan's lockdown order, the Court need not assess that issue because Barna, like all the plaintiffs, has failed to show that delay in reinstatement of his privileges constitutes such a substantial departure from professionally accepted judgment as to rise to the level of a constitutional violation.

unpleasant, substantially departed from accepted professional judgment, practice or standards, and thus the presumption of correctness afforded defendants' professional judgment is unrebutted.

■ Moreover, insofar as plaintiffs claimed at oral argument that these defendants were responsible for the claimed unconstitutional delays, interruptions or deprivations of plaintiffs' individualized treatment because these defendants were "in charge" of the various institutions, such allegation alone is legally insufficient to support a 42 U.S.C. § 1983 claim. The doctrine of respondeat superior does not apply to § 1983 actions and cannot be used as a substitute for these defendants' personal involvement, of which plaintiffs acknowledged they have no evidence beyond the issuance of the order. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994).

### CONCLUSION

In sum, under any of plaintiffs' theories of liability, the Court finds that it was objectively reasonable for these defendants to believe that their actions, in issuing and adopting the order confining all PSRB patients to secure wards until their privilege levels were individually reassessed, did not violate any clearly established substantive due process right of PSRB patients to treatment. Accordingly, defendants are entitled to judgment on plaintiffs' § 1983 substantive due process claims, on the basis of qualified immunity.

Further, because procedural due process requirements only impose constraints on state governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fourteenth Amendment, see *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976), in light of the Court's conclusion that plaintiffs have no substantive liberty interest in the treatment they claim, defendants necessarily were objectively reasonable in believing that their actions did not violate any clearly established procedural due process rights of plaintiffs. Thus, defendants are entitled to qualified immunity on plaintiffs' § 1983 procedural due process claims as well.

Accordingly, defendants' Motion for Summary Judgment [doc. # 60] is GRANTED. The clerk is directed to close the case.

IT IS SO ORDERED.