Dennis BUTHY, Plaintiff-Appellant,

v.

The COMMISSIONER OF the OFFICE OF MENTAL HEALTH OF NEW YORK STATE, the Director of the Gowanda Psychiatric Center, Defendants-Appellees.

No. 729, Docket 84–7748.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1987.

Decided May 18, 1987.

---

Philomena A. Reilly, Robin C. Frankel, Law Student Interns, Hempstead, N.Y. (Professor Carolyn A. Kubitschek, Janine Davitian, Lee Lederman, Valerie Voges, Ruth Weinreb, Law Student Interns, Community Legal Assistance Corp., Hempstead, N.Y., of counsel), for plaintiff-appellant.

Clifford A. Royael, Albany, N.Y. (Robert Abrams, Atty. Gen., of State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Asst. Atty. Gen., Albany, N.Y., of counsel), for defendants-appellees.

Before NEWMAN, CARDAMONE * and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Dennis Buthy appeals from Chief Judge Curtin's dismissal of his constitutional challenge to various conditions of his confinement in the forensic unit of the Gowanda Psychiatric Center ("Gowanda") in Helmuth, New York. Chief Judge Curtin dismissed Buthy's due process challenge for failure to state a claim upon which relief could be granted and subsequently granted summary judgment dismissing Buthy's equal protection challenge. We affirm.

## BACKGROUND

On April 25, 1972, a New York state court found Buthy not guilty by reason of insanity of a charge of first-degree assault based on his attack on a young woman with knives and a meat cleaver. As a result, he was committed to the custody of the Commissioner of the Office of Mental Health ("Commissioner").[1]

For most of the period since his insanity acquittal, Buthy has been confined in state institutions for the care and treatment of the mentally ill. He escaped from custody for several days in 1979 and for several months in 1980, and was detained in penal institutions for some time following each escape. He is now in the forensic unit at Gowanda pursuant to a determination of the New York Supreme Court that he suffers from a "dangerous mental disorder." The population of the forensic unit consists entirely of men who have been acquitted of crimes by reason of insanity or who have been arrested and found incompetent to stand trial.

On September 29, 1981, Buthy commenced the instant suit *pro se* against the Commissioner and the Director of Gowanda under 42 U.S.C. § 1983 (1982). He alleged, *inter alia*, that certain conditions of his confinement were so harsh in themselves, and so much harsher than the conditions imposed on civilly committed patients at Gowanda, as to offend the due process and equal protection clauses of the fourteenth amendment.

The district court dismissed Buthy's due process challenge to the forensic unit's sleeping regulations and to his being transported to court in handcuffs on the ground that he had failed to state a claim upon which relief could be granted. However, the court held that Buthy's equal protection challenge based on dissimilar treatment for the forensic unit and civilly committed patients did state a cause of action. The parties then sought summary judgment on the equal protection claim. The district court deferred action on these motions to permit the submission of additional materials by counsel who had recently been

---

* Judge Cardamone recused himself from this case after oral argument. The appeal was decided by the two remaining members of the panel pursuant to § 0.14(b) of the Rules of the United States Court of Appeals for the Second Circuit.

1. Buthy had been convicted on the assault charge at two earlier trials. Both convictions were reversed on appeal. *See People v. Buthy*, 33 A.D.2d 986, 307 N.Y.S.2d 366 (N.Y.App.Div. 1970); *People v. Buthy*, 38 A.D.2d 10, 326 N.Y. S.2d 512 (N.Y.App.Div.1971).

retained to represent Buthy. On July 23, 1984, the court granted summary judgment to the defendants.

Buthy filed a *pro se* notice of appeal, and this court appointed the Community Legal Assistance Corporation of Hempstead, New York to represent him.

## DISCUSSION

### I.

Buthy claims that he has been denied the equal protection of the laws because allegedly more onerous restrictions are imposed on patients in the forensic unit than are imposed on civilly committed patients housed elsewhere at Gowanda. Specifically, he complains that only patients in the forensic unit must have their mail opened by staff members, are prohibited from receiving gifts of food from visitors (except for one portion consumed in the public area during visits) and visiting the hospital commissary. The defendants argue that any such differences in the treatment of forensic unit patients and civilly committed patients are justified by security and space considerations. *See* Affidavit of Dr. Jean B. Jackson, program director of the forensic unit ("Jackson affidavit").

■ When one group of persons is treated differently from another because of "distinguishing characteristics relevant to interests the state has the authority to implement, ... the Equal Protection Clause requires only a rational means to serve a legitimate end." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). Accordingly, we must assess what characteristics, if any, distinguish patients in the forensic unit from patients in the civil wards, whether these characteristics give rise to legitimate state concerns, and whether the state has chosen rational means to address such concerns.

■ In the view of hospital officials, the principal factor that distinguishes forensic unit patients from civilly committed patients is that the former pose a greater threat to institutional security than do the latter. We cannot conclude that this view is unreasonable, *see Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (court should not "second-guess the expert administrators on matters on which they are better informed") (quoting *Bell v. Wolfish*, 441 U.S. 520, 544, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)), especially given that different criteria for admission apply to the forensic unit and the civil wards.

The forensic unit is composed entirely of insanity acquittees and persons who have been charged with crimes but found incompetent to stand trial. The former have been found beyond a reasonable doubt to have committed criminal acts, a finding that in itself "certainly indicates dangerousness," *Jones v. United States*, 463 U.S. 354, 364, 103 S.Ct. 3043, 3049, 77 L.Ed.2d 694 (1983). Moreover, each insanity acquittee in the forensic unit has been adjudicated to be suffering from a "dangerous mental disorder" as defined in N.Y.Crim. Proc.Law § 330.20(1)(c). *See generally* N.Y.Crim.Proc.Law § 330.20 (McKinney 1983 & Supp.1987). Acquittees found not to be suffering from such a disorder are not confined in the forensic unit. N.Y. Crim.Proc.Law § 330.20(12), (13) (McKinney Supp.1987). Those found incompetent to stand trial are the subject of outstanding criminal charges based on a finding of probable cause. These circumstances are sufficient to justify on security grounds different treatment of these two groups than that accorded persons civilly committed. We may assume that some civilly committed patients have also committed criminal acts and are dangerous.[2] Nevertheless, hospital officials may reasonably conclude that the civilly committed as a

---

**2.** Only those civil patients committed to Gowanda involuntarily have similarly been found to pose a danger to themselves or others. *See* N.Y.Mental Hyg.Law §§ 9.13 (voluntary admissions), 9.27, 9.37 (involuntary admissions); 9.39 (emergency admissions) (McKinney 1978 & Supp.1987); *In re Scopes*, 59 A.D.2d 203, 205–06, 398 N.Y.S.2d 911, 913 (N.Y.App.Div.1977) (holding that due process requires that involuntary commitment be based on a finding of dangerousness).

group represent less of a risk than those in the forensic unit. If a civilly committed patient is deemed particularly dangerous, his conditions of confinement may be determined on an individualized basis.

The uncontroverted evidence before the district court established that the rules challenged by Buthy are reasonably directed at the threat to institutional security posed by the forensic unit population, a legitimate state concern. *See Youngberg v. Romeo,* 457 U.S. at 324, 102 S.Ct. at 2462 ("The State ... has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution."). The rules requiring that staff members open patients' incoming mail[3] and that patients receive no gifts of food from visitors (except for amounts consumed during visits)[4] protect patients and staff by preventing the introduction of contraband into the forensic unit. It is not unreasonable for hospital officials to decline to apply these rules to the civilly committed patients, who are perceived as minor security risks relative to the forensic unit patients.

With regard to the commissary rules, uncontroverted evidence offered by the defendants established, contrary to Buthy's allegations, that not all forensic unit patients are barred from visiting the commissary to purchase meals and other items. *See* Jackson affidavit at ¶ 16. However, this privilege is restricted, both in the forensic unit and in the civil wards, to those patients who have demonstrated sufficiently trustworthy behavior. *See id.* Buthy's behavior has not yet improved to the extent that he has been allowed to visit the commissary. *See id.*

In sum, we conclude that the rules Buthy challenges are a rational means of promoting the legitimate end of institutional security.

## II.

We turn now to Buthy's claim that the defendants denied him due process of law by requiring all forensic unit patients to remain awake for a fixed 16 hour period each day and by transporting him to a court appearance in handcuffs.

The Supreme Court has recognized that patients at state mental institutions enjoy "constitutionally protected interests in ... reasonably nonrestrictive confinement conditions." *Youngberg v. Romeo,* 457 U.S. at 324, 102 S.Ct. at 2462. In determining whether a state has met its obligations in this regard, courts generally must balance "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty," *id.* at 320, 102 S.Ct. at 2460, according "a presumption of correctness" to the decisions of "appropriate professional[s]." *Id.* at 324, 102 S.Ct. at 2462.

The Supreme Court has also acknowledged, however, that some restrictions on individual liberty rise only to "a de minimis level of imposition with which the Constitution is not concerned." *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); *see also Bell v. Wolfish,* 441 U.S. at 539 n. 21, 99 S.Ct. at 1874 n. 21 (1979). Such restrictions may survive constitutional scrutiny even absent any express showing that they are reasonably related to a legitimate state interest. *Cf. Bell v. Wolfish,* 441 U.S. at 539 & n. 21, 99 S.Ct. at 1874 & n. 21 (outlining standard applicable to impositions that are not *de minimis*).

■ The rule that requires forensic unit patients to remain awake for the 16 hour period constitutes just such a *de minimis* imposition on individual liberty. Like restrictions relating to meals, exercise, and other aspects of daily institutional life, re-

---

3. The uncontroverted affidavit of Dr. Jackson establishes that staff members do not read patients' incoming mail "unless there are documented reasons why [it] has to be censored." Jackson affidavit at ¶ 20.

4. The restrictions on gifts of food to forensic unit patients are justifiable on the basis of institutional security alone. We therefore need not decide whether the restrictions are also justifiable on the ground that there is less available storage space in the forensic unit than the civil wards. In any event, the effects of these restrictions are ameliorated by the ability of forensic unit patients to purchase snacks from the commissary cart.

strictions on sleeping hours are mere "incidental elements in the organized caretaking of the general company of [inmates]." *Bijeol v. Nelson,* 579 F.2d 423, 424 (7th Cir. 1978) (per curiam) (quoting *Butler v. Crumlish,* 229 F.Supp. 565, 566 (E.D.Pa. 1964)). On its face, the 16–hour rule simply ensures that the normal sleeping period in the institution will be an eight-hour interval during the nighttime. Chaos might well prevail absent such rules. For example, without rules as to sleeping hours conflicts might arise between patients wanting to sleep and those who do not. A patient committed to the forensic unit, like a pretrial detainee, "has no constitutional right to order from a menu or have maid service." *Bijeol,* 579 F.2d at 424. Neither does he have a constitutional right to an afternoon nap.

We recognize that a facially permissible rule may violate constitutional rights if unreasonably applied. However, Buthy has not alleged any specific instance of unreasonable application of the rule. While Buthy's appellate counsel hypothesized that a patient might be punished if medication or physical illness cause him to fall asleep during the day, they conceded at oral argument that there is no evidence that punishment has ever been imposed in such circumstances.

█ The use of handcuffs in transporting insanity acquittees such as Buthy to court appearances also does not amount to a constitutional violation. It is clear that whatever liberty interest may be implicated by such a restraint is substantially outweighed by the state's security interest in preventing the escape of persons adjudicated to be dangerous. *See* Part I, *supra.* The use of handcuffs was particularly justifiable in the case of Buthy, an insanity acquittee with a record of escapes.[5]

### III.

█ Buthy also contends that he is entitled to a trial on the question of whether the defendants denied him adequate treat-

ment in violation of his rights under the due process clause. *See Youngberg v. Romeo,* 457 U.S. at 319, 102 S.Ct. at 2459 (recognizing constitutionally protected liberty interest in "minimally adequate or reasonable training" at state mental hospital). However, we find nothing in Buthy's *pro se* complaint, even when construed liberally, *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam), that alleges a denial of treatment. A conclusory allegation is contained in an affidavit submitted by Buthy's father in support of an unsuccessful motion to intervene, but, even if considered in elaboration of Buthy's complaint, the affidavit is too vague to provide the basis for injecting a denial of treatment claim into the lawsuit.

Finally, although allegations of inadequate treatment were contained in the memorandum submitted by Buthy's counsel in connection with the summary judgment motions, neither Buthy nor his counsel presented any evidence of inadequate treatment to the district court. Buthy's appellate counsel have offered us no reason to believe that such evidence exists.

### IV.

█ Buthy also contends that his due process rights were violated when he was placed in the forensic unit in 1980 without a prior hearing. Chief Judge Curtin correctly held that Buthy could challenge the fact of his pre-hearing confinement in the forensic unit, as opposed to the conditions of that confinement, only by petitioning for a writ of habeas corpus and after exhausting state remedies as required by 28 U.S.C. § 2254(b), (c) (1982). *See Souder v. McGuire,* 516 F.2d 820, 823 (3d Cir.1975) ("There is no question about the appropriateness of habeas corpus as a method of challenging involuntary commitment to a mental institution."); *O'Beirne v. Overholser,* 287 F.2d 133, 136 (D.C.Cir.1960) ("Habeas corpus is the traditional means of seeking release from illegal confinement.

**5.** There is no claim that Buthy was presented in handcuffs before the court and was prejudiced

thereby.

It is the normal means in this jurisdiction of testing the legality of detention in a mental hospital, whether based on civil or criminal proceedings."). *See generally* 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4263 at 624 (1978) ("if the prisoner is challenging the very fact or duration of his physical imprisonment habeas corpus is the only remedy available and state remedies must first be exhausted").

■ However, we lack jurisdiction to review the district court's denial of habeas corpus relief because Buthy failed to seek a certificate of probable cause from either the district court or this court. *See* 28 U.S.C. § 2253 (1982); *McCarthy v. Harper*, 449 U.S. 1309, 101 S.Ct. 827, 66 L.Ed.2d 782 (Rehnquist, Circuit Justice 1981). Accordingly, the appeal from that decision is dismissed.

## V.

■ We have examined Buthy's claims regarding the appointment of counsel in the district court and determine them to be without merit. Though the initial denial of Buthy's request on the ground of difficulty in identifying lawyers willing to represent *pro se* litigants may well have been beyond even the broad discretion accorded district judges in deciding whether to appoint counsel, *see Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir.1986); *In re Martin-Trigona*, 737 F.2d 1254, 1260 (2d Cir.1984), *cert. denied*, — U.S. —, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986), no error affecting substantial rights occurred in this case since retained counsel subsequently appeared on Buthy's behalf. His other claims are either wholly meritless or were not raised in the district court.

The judgment of the district court is therefore affirmed.