214 F.3d 350 (2nd Cir. 2000)
 CHARLES W., ANTHONY L., GEORGE K., on behalf of themselves and other similarly situated individuals, and MENTAL DISABILITY LAW CLINIC, TOURO LAW CENTER, Plaintiffs,
ROY MCGHIE, Plaintiff-Appellee,
v.
THOMAS MAUL, in his official capacity of Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities, ROSALYN RICHTER, in her official capacity of New York City Criminal Court Judge, on behalf of herself and all other local criminal court judges in New York State, ROBERT M. MORGANTHAU, in his official capacity as District Attorney of New York County, WILLIAM GRADY, in his official capacity of District Attorney of Dutchess County, JAMES L. STONE, in his official capacity of Commissioner of the New York State Office of Mental Health, CHARLES HYNES, in his official capacity of District Attorney of Kings County, on behalf of himself and all other district attorneys in New York State, Defendants,
JOEL DVOSKIN, Ph.D., personally, and in his official capacity of Acting Commissioner of the New York State Office of Mental Health, LUCY RAE SARKIS, personally, Defendants-Appellants.
 Docket No. 98-9290
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued May 20, 1999
Decided: June 05, 2000
 
 Defendants Joel Dvoskin and Lucy Rae Sarkis appeal from a judgment entered March 27, 1998 in the United States District Court for the Eastern District of New York (Sifton, C.J.), denying their motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff Roy McGhie's complaint that alleged a §1983 cause of action against defendants.
 Reversed and remanded.[Copyrighted Material Omitted]
 LYSSA M. SAMPSON, Assistant Attorney General, New York, New York (Dennis C. Vacco, Attorney General, John W. McConnell, Deputy Solicitor General, Robert A. Forte, Assistant Attorney General for the State of New York, New York, New York, of counsel), for Defendants-Appellants.
 WILLIAM M. BROOKS, Mental Disability Law Clinic, Touro College, Huntington, New York, for Plaintiff-Appellee.
 Before: CARDAMONE, JACOBS, Circuit Judges, and McMAHON*., District Judge.
 CARDAMONE, Circuit Judge:
 
 
 1
 Plaintiff Roy McGhie, having been found incompetent to stand trial on a misdemeanor charge, was remanded to a New York state psychiatric center for a brief period, to evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law. His confinement there prompted his suit under 42 U.S.C. § 1983 in which he claims defendants Joel Dvoskin and Lucy Rae Sarkis, as state mental health officials, violated his constitutional rights to due process and equal protection in failing to treat him on an equal footing with candidates for civil commitment. Defendants moved to dismiss plaintiff's complaint asserting qualified immunity, a defense that depends upon whether the right plaintiff asserts is so clearly established that defendants should have known it. A right may be said to be clearly established when it has been recognized either by the Supreme Court or by the applicable Circuit Court. Whether a right recognized only by a trial court or by a state court is clearly established presents a closer question. We had ruled prior to plaintiff's remand to the hospital that some difference in treatment by the state between civil admittees and those remanded from criminal court having been found incompetent to stand trial may be justified. Subsequent to our ruling, a state trial judge held, in a case unrelated to this one, that such different treatment violated that plaintiff's constitutional rights. It is on this state court ruling that McGhie rests his claim.
 
 
 2
 The district court agreed with plaintiff. It therefore denied defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and entered judgment against defendants on March 27, 1998 in the United States District Court for the Eastern District of New York (Sifton, C.J.). We think under the circumstances that plaintiff has not alleged a due process violation, and the alleged equal protection right could not be said to be so surely established as not to admit to substantial doubt and, as a consequence, it was error to deprive defendants of qualified immunity. Hence, we reverse.
 
 BACKGROUND
 
 3
 Plaintiff McGhie is an individual plaintiff in a yet uncertified class action brought in the Eastern District of New York on behalf of a proposed class of patients initially committed to, or detained by, facilities operated by the New York State Office of Mental Health or the New York State Office of Mental Retardation and Developmental Disabilities allegedly in violation of their civil rights. Defendant Dvoskin is the former Associate Commissioner of the Office of Mental Health. Defendant Sarkis is the Executive Director of the South Beach Psychiatric Center (Center) located in Richmond County, New York. Plaintiffs named as defendants a number of other officials not before us on this appeal.
 
 
 4
 The complaint alleges, inter alia, that plaintiffs' commitment to the Office of Mental Health or the Office of Mental Retardation facilities pursuant to N.Y. Crim. Proc. Law §§730.40 and 730.60 after they were found incompetent to stand trial for misdemeanors or minor felonies violated their constitutional rights to equal protection and due process. Specifically, plaintiffs contend these rights were violated because they were not afforded the same procedural protections that govern civil commitments, and because the nature of such commitment did not bear a reasonable relation to the purpose for which they were committed.
 
 
 5
 Plaintiffs premised their claims on a decision of the New York State Supreme Court, Westchester County, in Ritter v. Surles, 144 Misc. 2d 945 (N.Y. Sup. Ct. Westchester Co. 1988), that declared unconstitutional certain aspects of New York's statutory scheme for involuntary commitment of individuals found incompetent to stand trial. Plaintiffs also sought injunctive relief - such claims are currently in settlement negotiations. Plaintiff McGhie alone asserted a claim for monetary damages against defendants Dvoskin and Sarkis in their individual capacities.
 
 A. Statutory Framework
 
 6
 To understand the issues on appeal, a brief summary of New York law governing commitment to state mental health facilities is helpful. When a local criminal court is presented with a defendant who may be unfit to stand trial, the court must order an examination of the defendant, see N.Y. Crim. Proc. Law §730.30(1) (McKinney 1995), and may also hold a hearing if the defendant requests one or if the court deems it necessary, see id. §730.30(2). Under New York Criminal Procedure Law, an "incapacitated person" is defined as "a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." Id. §730.10(1). Upon a finding by the local court that a defendant is an incapacitated person, §730.40(1) requires the court to "issue a final or temporary order of observation committing him to the custody of the [Commissioner of Mental Health] for care and treatment . . . for a period not to exceed ninety days from the date of the order." Id. §730.40(1). If the charge is for a misdemeanor, the order must be a "final order of observation;" if the accusatory instrument is a felony complaint, it must be a "temporary order," unless the district attorney consents to a final order. Id.
 
 
 7
 When the local court has issued a final order, it must then dismiss the charges against the incapacitated person. Such dismissal bars any further prosecution on the charge contained in the accusatory instrument. See id. §730.40(2). An individual committed under a final order of observation may be released at any time prior to the expiration of such order. But pursuant to N.Y. Comp. Codes R. & Regs. tit. 14, §540.9 (1995), before such a release can be made, the decision to release must be reviewed by a special hospital forensics committee, which acts as a second medical opinion on the appropriateness of the release.
 
 
 8
 In addition to such review prior to release, under N.Y. Crim. Proc. Law § 730.60(6) (McKinney 1995), a patient committed under a final order of observation may not be discharged, released on condition, placed in any less secure facility, or granted a temporary pass (collectively, placed on less restrictive status) without the facility first delivering written notice, at least four days in advance, to a number of officials, primarily law enforcement officials. Further, the hospital forensics committee must approve such placement in advance. See N.Y. Comp. Codes R. & Regs. tit. 14, § 540.9 (1995). This statutory scheme controls commitment of those individuals charged with commission of a crime.
 
 
 9
 Article 9 of New York's Mental Hygiene Law sets out the state's civil commitment scheme. Under this law, a psychiatric hospital may involuntarily admit a patient upon the certificates of two physicians and a confirmation of the need for hospitalization by a third physician. See N.Y. Mental Hyg. Law §9.27(a) & (e) (McKinney 1996). In an emergency, a hospital may admit a patient upon the certificate of one doctor who has determined that the patient has a mental illness that requires immediate inpatient care and is likely to result in serious harm to himself or others. See id. §§ 9.37(a); 9.39(a); 9.40(a). The need for immediate hospitalization must be confirmed by a staff physician prior to admission. See id. § 9.37(a).
 
 
 10
 Within 72 hours after admission, if the patient does not agree to hospitalization as a voluntary patient, certification from yet another staff physician that the patient is in need of involuntary treatment must be filed with the hospital. See id. In addition to the procedures just outlined, the confinement of a person "in need of involuntary care" is prohibited unless such person poses a substantial threat of physical harm to himself or to others. Id. However, the director may hold a previously voluntary patient who has requested release involuntarily for up to 72 hours before releasing the patient or applying for a court order of commitment if there are "reasonable grounds for belief" that the patient may require involuntary care and treatment. N.Y. Comp. Codes R. & Regs. tit. 14, §15.7(a) (1995).
 
 B. Decision in Ritter v. Surles
 
 11
 In Ritter v. Surles, 144 Misc. 2d 945 (N.Y. Sup. Ct. Westchester Co. 1988), a New York State Supreme Court Justice declared N.Y. Crim. Proc. Law §§730.40(1) and 730.60(6) and the related state regulation, N.Y. Comp. Codes R. & Regs. tit. 14, §540.3, unconstitutional under the U.S. Constitution. In Ritter a declaratory judgment action was brought by individual plaintiffs charged with misdemeanors, adjudged "incapacitated person[s]" and committed to state mental health facilities pursuant to final orders under N.Y. Crim. Proc. Law § 730. See 144 Misc. 2d at 946, 951. Because the individuals had been found incompetent, the criminal charges against them had been dismissed and the final order of observation barred their further prosecution on the charges. See id. at 951. Plaintiffs filed a declaratory judgment action against the Commissioners of Mental Health and Mental Retardation alleging that the process by which they were committed violated the U.S. Constitution. Their principal argument was that defendants failed to accord them due process and equal protection because individuals committed pursuant to §730.40 of New York's Criminal Procedure Law were treated differently from those involuntarily committed under the civil provision of the state's Mental Hygiene Law. See id. at 946, 948-49.
 
 
 12
 The New York court agreed, ruling that once criminal charges had been dismissed, there was no basis for involuntarily confining individuals absent compliance with the provisions of the Mental Hygiene Law. It found the provisions for commitment of those charged with commission of a crime facially unconstitutional. However, the state trial court did not order the individuals in question released; instead it gave the Mental Health Commissioner a choice either to release the plaintiffs or to initiate civil commitment proceedings against them. See id. at 951-52.
 
 
 13
 No party to Ritter appealed that 1988 decision. As acting Mental Health Commissioner at the time, defendant Dvoskin was responsible for his office's compliance with its obligations under Ritter. After Ritter was decided, Dvoskin wrote a memorandum (Dvoskin Memorandum) directed to regional and facility directors and forensic coordinators of the Mental Health Department outlining procedures to be followed as an "interim response" to and in an attempt to comply with Ritter. The memorandum required that all persons committed pursuant to §730.40 be evaluated to see if they met the civil commitment criteria, authorized the Office of Mental Health facilities to confine an incapacitated person for a 72-hour period without civilly committing him or her, and directed facilities to refrain from implementing certain procedures, including the hospital forensic committee review of placement on less restrictive status. Further, the memorandum stated that the notification provisions contained in §730.60(6) and the state regulation could no longer delay a patient's status change. Defendants concede that the procedures contained in the Dvoskin Memorandum did not embody the protections of Article 9, the civil commitment statute. They were intended as a stop-gap, so the state could consider whether to commence involuntary civil commitment proceedings against an individual whose misdemeanor charge had been dismissed due to his incompetence to stand trial.
 
 
 14
 As Director of the South Beach Psychiatric Center, where McGhie was committed, defendant Sarkis received the Dvoskin Memorandum. On October 13, 1994 the New York City Criminal Court (Duberstein, J.) found Roy McGhie incompetent to stand trial on his charge of second degree criminal trespass, N.Y. Penal Law §140.15. Pursuant to a §730.40 final order of observation, the court remanded him to the custody of the Office of Mental Health and dismissed the charge. After an involuntary detention of 72 hours or less, the state initiated successful civil commitment proceedings against McGhie. McGhie alleges that after his admission to South Beach Psychiatric Center, he was denied treatment he otherwise would have received because Sarkis subjected him to an automatic review process before authorizing any new or different treatment for him.
 
 
 15
 In his due process claim against defendant Dvoskin, plaintiff contends that the 72-hour period of post-dismissal confinement, which was authorized in the Dvoskin Memorandum, deprived him of his liberty without due process of law. The equal protection claim against defendant Sarkis rests on the allegation that, as Executive Director of the South Beach Psychiatric Center, she failed to implement the Center's compliance with the Dvoskin Memorandum. Instead, the Center continued to follow the procedures outlined in N.Y. Crim. Proc. Law §730.60 and N.Y. Comp. Codes R. & Regs. tit. 14, §540. Sarkis allegedly subjected McGhie to this automatic review process, depriving him of care and treatment he otherwise would have received. The Center's challenged review process, which the complaint describes as "devoid of procedural protections" and of time limits for initiating and completing reviews, was applied to all patients remanded pursuant to N.Y. Crim. Proc. Law §730.40 who were subject to final orders of observation, but not to Article 9 civil committees.
 
 
 16
 Defendants Dvoskin and Sarkis moved for dismissal of plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) on qualified immunity grounds. From the district court's denial of their motion, defendants appeal.
 
 DISCUSSION
 
 17
 Because this appeal is from the denial of a motion to dismiss under Fed. R. Civ. P. 12(b), we are required for present purposes to accept as true those factual assertions set forth in plaintiff's complaint, see Zinermon v. Burch, 494 U.S. 113, 118 (1990), and to read the complaint liberally, drawing all reasonable inferences in plaintiff's favor. See Fed. R. Civ. P. 12(b)(6); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1197-98 (2d Cir. 1996).
 
 
 18
 We review de novo a district court's denial of a motion to dismiss on qualified immunity grounds. See Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998); Jemmott v. Coughlin, 85 F.3d 61, 66 (2d Cir. 1996). At the motion to dismiss stage of a civil damages action, a defendant is entitled to the shield of qualified immunity if the allegations of the complaint fail to state a claim that his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). With these principles in mind, we examine the district court's decision denying defendants' motion to dismiss based on qualified immunity.
 
 I Existence of Right in Question
 
 19
 Under 42 U.S.C. §1983, a government official responsible for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." On appeal, McGhie argues that Dvoskin violated his due process rights and that Sarkis violated his equal protection rights. The Supreme Court has directed that before evaluating a qualified immunity defense under §1983, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999) (quoting Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999)); cf. Siegert v. Gilley, 500 U.S. 226, 231-33 (1991). If plaintiff has alleged such a right, we then proceed to determine whether it was clearly established at the time of the violation. See Wilson, 199 S. Ct. at 1697; Conn, 119 S. Ct. at 1295. We acknowledge that the Court should not determine the existence of the constitutional right alleged if the question could be decided in proceedings in which qualified immunity is not a defense. See Horne v. Coughlin, 191 F.3d 244, 250 (2d Cir. 1999).
 
 
 20
 At this early stage of litigation, we are mindful that the district court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Kaluczky v. City of White Plains, 57 F.3d 202, 206 (2d Cir. 1995) (noting this cautionary standard applies with greater force in the civil rights context). To state a claim under 42 U.S.C. § 1983, McGhie must allege that the challenged conduct was attributable to a person acting under color of state law, and that such conduct deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. As reiterated in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), a §1983 claim is subject only to the notice pleading requirements of Fed. R. Civ. P. 8. That is to say, all it must contain is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).
 
 
 21
 At the outset, we reject plaintiff's assertion that the mere existence of the Ritter decision guarantees his victory. Contrary to the view plaintiff expressed at oral argument, the purpose of §1983 actions is not the creation of another mechanism to enforce state court decisions but to provide "a federal forum for civil rights claims." Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). If McGhie simply wished to enforce Ritter v. Surles, he should have pursued New York remedies. In a §1983 case, we are obligated to assess independently whether the state's conduct violated a constitutional right. State court decisions, like the decisions of other federal lower courts, are relevant and often persuasive. Yet, we are in no way obliged to enforce them.
 
 
 22
 Of course, if issue preclusion applied, the state court's holding would be binding. See Allen v. McCurry, 449 U.S. 90, 101-03 (1980). However, McGhie does not contend that issue preclusion prevents the defendants from litigating the constitutional issues here. He rather indirectly alludes to issue preclusion in arguing that "Dvoskin and Sarkis should have understood that Ritter served as controlling authority and hence, that they were obligated to implement its decision and judgment." In any case, we are not persuaded that a single 1988 lower New York court decision on this pure question of federal constitutional law, involving different plaintiffs and seeking only declaratory relief, would bar relitigation of the federal constitutional questions in the instant case. Cf. United States v. Alcan Aluminum Corp., 990 F.2d 711, 718-19 (2d Cir. 1993); Benjamin v. Coughlin, 905 F.2d 571, 575-76 (2d Cir. 1990).
 
 II Due Process Claim Against Dvoskin
 
 23
 Turning to the merits, McGhie avers that by confining him for 72 hours or less (the exact duration of the confinement is uncertain), pursuant to Criminal Procedure Law §730.40, defendant Dvoskin deprived him of his due process rights under color of state law. A basic flaw in McGhie's argument is that at the time of his confinement, Dvoskin was not applying §730.40 as written and as declared unconstitutional in Ritter. The complaint alleges that Dvoskin had circulated a memorandum in April 1990 instructing state mental health officials to follow a different set of procedures intended to conform to the Ritter holding, and that McGhie was involuntarily remanded to defendants' custody in November 1994 in accordance with these newly promulgated procedures. The issue before us therefore is not whether Ritter established a clear constitutional rule, but whether the procedures under which the state in fact confined McGhie violated his constitutional rights. We must decide whether this alleged due process right exists before reaching the issue of qualified immunity because McGhie's due process claim presents a question that is unlikely to be reviewed in a proceeding in which qualified immunity is not a defense, such as an action for injunctive relief. Indeed, it would be virtually impossible for someone in McGhie's position to obtain meaningful injunctive relief given the brevity of his allegedly unlawful confinement and the fact that he was committed immediately after the state court's issuance of the final order of observation. Cf. Horne, 191 F.3d at 250 n.6.
 
 
 24
 The seminal case in this area, Jackson v. Indiana, 406 U.S. 715 (1972), sets out the standards against which we must measure the due process and equal protection rights of criminal defendants found incompetent to stand trial. In Jackson, a mentally impaired deaf mute incapable of meaningful communication was charged with two robberies. The Indiana court found that he lacked the ability to assist in his defense and ordered him committed to the Indiana Department of Mental Health until the court found that he was sane. Jackson's likelihood of ever attaining the ability to assist in his defense, in other words, of becoming "sane," was very slim and thus his commitment would likely have been for an indefinite period of time. Such an indefinite commitment under Indiana law did not require a finding that detention was necessary, such as a finding that the defendant was dangerous to himself or others.
 
 
 25
 The Supreme Court ruled the Indiana statute unconstitutional because it violated both Jackson's equal protection and his due process rights. See id. at 730, 731. The High Court held that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Id. at 738. It further stated that
 
 
 26
 [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.
 
 
 27
 Id. Thus, our task is to evaluate whether the "nature and duration" of McGhie's confinement bore "some reasonable relation" to its purpose. Id.; accord Woe v. Cuomo, 729 F.2d 96, 105 (2d Cir. 1984). The purpose of McGhie's confinement was to evaluate his possible mental illness, strongly indicated by plaintiff's involvement with the criminal justice system coupled with a finding of incompetency to stand trial.
 
 
 28
 In Project Release v. Prevost, 722 F.2d 960 (2d Cir. 1983), we upheld the constitutionality of New York's civil commitment scheme against a facial due process challenge. We specifically noted a provision allowing the state to hold a voluntary patient who has requested release for up to 72 hours if "there are reasonable grounds for belief that the patient may be in need of involuntary care and treatment," id. at 966 (quoting N.Y. Mental Hyg. Law §9.13(6) (McKinney 1978)), and went on to hold that the state's procedural scheme as a whole satisfied both substantive and procedural due process, id. at 974-45. The 72-hour period at issue here is directly analogous to that upheld in Project Release. If anything, the state's interests in brief administrative confinement are stronger in the present case, where the charges against the incompetent defendant evidence his possible dangerousness. Further, at oral argument McGhie's counsel conceded that persons held for ordinary civil commitment are usually held briefly for observation prior to their formal commitment, even though no such observation period is set out in the civil commitment statute.
 
 
 29
 Moreover, as we observed in Goetz v. Crosson, 41 F.3d 800, 804 n.1 (2d Cir. 1994), the issues presented at a commitment hearing are more complex than those presented at a competency hearing. The state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed. Finally, civil commitments are generally initiated by someone outside the mental health system. When the initiator is a member of the patient's family, his physician, or friend, rather than the criminal justice system, more useful diagnostic information may be readily available to the state at the outset of the evaluation period.
 
 
 30
 The challenged confinement procedure serves legitimate government interests in caring for the mentally ill and in promoting community safety. See Project Release, 722 F.2d at 971; cf. United States v. Salerno, 481 U.S. 739, 748 (1987) (noting in the context of pretrial detention that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest"). Of course, a person found incompetent to stand trial has not been convicted of anything. At the same time, such a person is "the subject of outstanding criminal charges based on a finding of probable cause." Buthy v. Commissioner of the Office of Mental Health, 818 F.2d 1046, 1049 (2d Cir. 1987). The Supreme Court has suggested that in considering the legitimacy of involuntary commitment, a criminal charge may be evidence of past anti-social behavior. See Kansas v. Hendricks, 521 U.S. 346, 357 (1997) (dicta).
 
 
 31
 The state's legitimate interests justify confining those found incompetent to stand trial for a reasonable evaluation period. Neither Jackson, nor even Ritter, instructed the states to release the individuals immediately, but rather allowed them to choose either to release such persons or to initiate civil commitment proceedings. See Jackson, 406 U.S. at 738 ("If it is determined [that Jackson will not attain capacity to stand trial] then the State must either institute the customary civil commitment proceeding ... or release the defendant."); Ritter, 144 Misc. 2d at 951 ("This decision does not require these individuals to be released. They are subject to [state procedures] for involuntary commitment ...."). The state has need of the reasonable flexibility afforded it by a limited time to decide whether to initiate civil commitment proceedings and then, if necessary, to initiate them. The state maintained at oral argument that this time was needed to evaluate McGhie, and plaintiff conceded that some time was proper for such purpose. A 72-hour confinement is not excessive to accomplish evaluation.
 
 
 32
 Consequently, McGhie's confinement under the 72-hour provision in the Dvoskin Memorandum did not violate his due process rights and plaintiff has not stated a claim under §1983 on this basis.
 
 III Equal Protection Claim Against Sarkis
 
 33
 McGhie grounds his equal protection claim against defendant Sarkis on the allegation that she "subjected [him] to an automatic and protracted review process for increased privileges, change in legal status and release" that "resulted in his receiving more onerous treatment than others similarly situated," i.e., other civil committees. He alleges in part that because of Sarkis' failure to ensure compliance with Ritter, the Center denied him off-ward therapies warranted by his clinical condition and placement in a program suitable for his condition that treated both mental illness and substance abuse.
 
 
 34
 The district court decided the qualified immunity question before reaching the underlying constitutional issue. This approach was correct in light of Horne, 191 F.3d 244. Unlike McGhie's due process claim, his equal protection claim could have been reviewed by way of a habeas corpus petition or an action for an injunction - proceedings in which qualified immunity is not a defense. See id. at 250.
 
 
 35
 As discussed above, in actions for civil damages arising out of alleged violations of federal law, state officials are entitled to qualified immunity. See O'Connor v. Donaldson, 422 U.S. 563, 577 (1975). But whether qualified immunity applies depends on whether the right violated was clearly established. See Harlow, 457 U.S. at 818. Higher-ranking officials, as is the case here, are held to a higher standard of legal knowledge than are their subordinates. See Duchesne v. Sugarman, 566 F.2d 817, 833 n.32 (2d Cir. 1977). We use three factors to determine whether a given right is "clearly established." First, whether it is "defined with reasonable specificity"; second, whether "the decisional law of the Supreme Court or the appropriate circuit court has clearly established the right"; third, "whether in light of preexisting law the unlawfulness of the defendant official's actions is apparent." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989). The district court held that a single state trial court decision can "clearly establish" the relevant constitutional right in a case such as this one. It reasoned that when the government defendants are the very ones who litigated and lost the relevant state court case, they should not later be permitted to plead ignorance of its holding.
 
 
 36
 We see no need to reach this somewhat problematic question. Ritter v. Surles, the state trial court decision at issue, rested its equal protection holding on the premise that "[a]s with criminal acquittees, there is no constitutionally permissible reason to create two classes of incapacitated people; those who have misdemeanor charges dismissed against them, and those who are considered dangerous to themselves or others, and committed involuntarily." 144 Misc. 2d at 951. This reasoning directly conflicts with our prior holding in Buthy. The Buthy panel had held such a distinction, grounded on security concerns, did not violate the equal protection clause. See 818 F.2d at 1049-50.
 
 
 37
 In Buthy we addressed a §1983 claim challenging on equal protection grounds the allegedly more onerous restrictions placed on patients in the forensic unit of the Gowanda Psychiatric Center. The forensic unit housed insanity acquittees and individuals who had been charged with crimes but found incompetent to stand trial. Civil committees were confined to other wards and subject to lesser restrictions. Among other things, Buthy challenged the ban on gifts of food to forensic unit patients (except for food consumed during the giver's visit) and staff's reading of forensic unit patients' incoming mail. We accepted as reasonable hospital officials' view that forensic unit patients "pose[d] a greater threat to institutional security," id. at 1049, than did civil ward patients and found the challenged rules to be "rational means of promoting the legitimate end of institutional security," id. at 1050.
 
 
 38
 Under these circumstances, Ritter could not "clearly establish" an equal protection right in McGhie's case as one that Sarkis as a reasonable state official should have known. Although Ritter defined a right with reasonable specificity, the right it posited was at odds with this Circuit's applicable law. In claiming the existence of a constitutional right, plaintiff may not exploit a lower state court opinion - inconsistent with this Circuit's precedent - as clearly establishing that right sufficient to deprive state officials, regardless of the level of their positions, of a qualified immunity defense. As a consequence, the right upon which McGhie relies can not be said to have been clearly established. We therefore dismiss McGhie's equal protection claim against defendant Sarkis.
 
 CONCLUSION
 
 39
 For the foregoing reasons, the denial of defendants' motion to dismiss is reversed, and the case is remanded to the district court with instructions to enter an order dismissing plaintiff's complaint against defendants Dvoskin and Sarkis on the grounds that plaintiff has not alleged a constitutional violation by Dvoskin, and Sarkis is entitled to qualified immunity.
 
 
 
 Notes:
 
 
 *
 Hon. Colleen McMahon, United States District Court Judge for the Southern District of New York, sitting by designation.