10-1193-CV
Ahlers v. Rabinowitz

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: December 7, 2011    Decided: April 6, 2012)

Docket No. 10-1193

- - - - - - - - - - - - - - - - - - - -x

KARL AHLERS,

                    Plaintiff-Appellant,

          - v.-

STEVEN RABINOWITZ, Director, Manhattan Psychiatric Center, DORA DEATRAS, Ward D-9-B Treatment Team Leader, Manhattan Psychiatric Center, IMOGINE THOMPSON, Ward D-9-B, Staff Member, Manhattan Psychiatric Center, FELICITY MOE, Ward D-9-B, Staff Member, Manhattan Psychiatric Center,

                    Defendants-Appelles.

- - - - - - - - - - - - - - - - - - - -x

     Before:         JACOBS, Chief Judge, CABRANES and WESLEY, Circuit Judges.

     Plaintiff appeals from a judgment entered in the Southern District of New York (Crotty, J.) dismissing his 42 U.S.C. § 1983 claims.  We agree with the district court's analysis; but we undertake to clarify some applicable principles and affirm on the ground of qualified immunity.

THOMAS H. DUPREE, JR. (Frederick Liu, Erik R. Zimmerman, on the brief), Gibson, Dunn & Crutcher LLP, Washington, D.C., for Appellant.

DAVID LAWRENCE III, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Michael S. Belohlavek, Senior Counsel, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, N.Y., for Appellees.

DENNIS JACOBS, Chief Judge:

Karl Ahlers appeals from a judgment entered in the United States District Court for the Southern District of New York (Crotty, J.) dismissing his claims under 42 U.S.C. § 1983. Ahlers is a convicted sex-offender who has been civilly committed post-release from prison. He alleges that when he was confined in the Manhattan Psychiatric Center (the "Center"), staff seized and withheld his personal DVDs and CDs and his incoming non-legal mail in violation of the First and Fourth Amendments and his procedural due process rights. The district court did not err in concluding that the complaint fails to state any claim for which relief can be granted. See Fed. R. Civ. P. 12(b)(6). This opinion

2

undertakes to clarify some applicable principles.  We affirm the judgment of the district court because, in any event, it was objectively reasonable for the Center staff to believe that their acts did not violate Ahlers's rights.  They are therefore entitled to qualified immunity.

**BACKGROUND**

In August 1982, Ahlers was convicted of sex offenses involving children aged seven to sixteen: specifically, two counts of sodomy in the first degree, one count of sodomy in the second degree, one count of sodomy in the third degree, three counts of sexual abuse in the first degree, and two counts of endangering the welfare of a child.  People v. Ahlers, 470 N.Y.S.2d 483, 483 (3d Dep't 1983).  After release from prison in 2005, Ahlers was involuntarily placed in civil custody, first in the Kirby Forensic Center and then, in August 2007, in the Sex Offender Treatment Program at the Center.  In December 2008, Ahlers filed a pro se complaint against the Center's Director, Steven Rabinowitz, and three Center employees--Dora Deatras, Imogine Thompson, and Felicity Moe --(collectively, the "Defendants") alleging that they withheld from him certain CDs and DVDs, and his

3

mail, in violation of the Constitution and federal law. The allegations are set out below.

**CDs and DVDs.** Ahlers alleges that because of his hearing loss, he was granted permission to have a personal DVD player, DVDs, and CDs, so that he could listen through headphones. Other patients received similar accommodations. Over time, with the Center's permission, Ahlers acquired a collection of 163 DVDs and 86 CDs (collectively, the "discs"). According to Ahlers, the DVDs contain content similar to what is broadcast on the Center's televisions, and the CDs contain classical music.

On April 21, 2008, staff entered Ahlers's room without warning, seized his DVD player and all his discs, and informed him that the discs would be reviewed and returned. On May 6, Ahlers met with his parole officer and members of his treatment team--defendants Deatras, Thompson, and Moe-- and he was assured that they would review his DVDs. On May 19, at a meeting of all the patients in Ahlers's ward, Deatras announced that the staff was screening for sexually explicit material.

On May 28, Ahlers met to discuss the seizure with the Center's Deputy Director, Charles Herrmann, who said he

4

would look into the matter, but did not get back to Ahlers. Ahlers followed up with a letter, but got no reply.

On May 30, Deatras returned 16 DVDs and the DVD player to Ahlers and presented him with a receipt, which indicated that 14 DVDs had been permanently confiscated for containing sexually explicit material and that 131 had yet to be reviewed.[1]

On June 18, Ahlers discussed the seizure with Don Graham, a lawyer in "Mental Health Services," who later met with the ward psychologist and Deatras. Two days later, Ahlers asked when he would get back the remaining discs, and was told by Deatras that just one person was available to screen DVDs, but that she would talk to that individual. Later that day, Deatras returned 15 DVDs, and told Ahlers that the remaining DVDs had not yet been reviewed.

Toward the end of June, Deatras gave Ahlers a list of the 14 permanently confiscated DVDs and a memo from defendant Steven Rabinowitz, Director of the Center, responding to a letter Ahlers had written. Rabinowitz advised that it was clinically inappropriate for Ahlers to

---

[1] This adds up to 161 DVDs. Ahlers alleges that 163 were seized. The complaint is confusing in this respect, and others.

have sexually explicit material and sexual material involving children, and that the permanently confiscated DVDs had been deemed clinically inappropriate.

On July 28, the Center returned ten more DVDs to Ahlers. On August 8, twenty more were returned.

**Mail.** On March 20, 2008, a United States Government Printing Office ("GPO") catalog arrived in the mail for Ahlers. Thompson withheld it to submit it to Deatras for review. On April 28, Ahlers asked Moe about it and was told a decision had not yet been made. On May 3, Deatras returned the catalog; with Ahlers's permission, the cover was removed.

On March 21, 2008, Thompson intercepted a piece of mail and turned it over to Deatras, who told Ahlers that it had been given to his social worker. Ahlers never received the item.

On April 28, Moe withheld an issue of Smithsonian magazine and a mail-order catalog. In response to Ahlers's inquiry about the magazine in early May, Deatras told Ahlers she had not yet had time to review it. On May 12, Moe returned the magazine.

Also on April 28, another patient informed Ahlers that he had seen a package addressed to Ahlers. Ahlers went to pick it up, but the package was not available. The next day, Ahlers received the package and was told by Deatras that she was holding pending review five catalogs and one magazine.

On May 5, defendant Thompson withheld a Heartland mail-order catalog and a catalog of DVDs. The Heartland catalog had a photograph of a replica revolver, and the DVD catalog had a photograph of Civil War soldiers with flintlock rifles. When Ahlers objected, Thompson gave him the DVD catalog, but withheld the Heartland catalog for review by a parole officer.

On June 24, Center staff withheld several brochures from the Chamber of Commerce of Klamath Falls, Oregon, which contained pictures of children in bathing suits. The brochures were not returned.

On July 11, an attendant told Ahlers that some of his mail was being withheld for review; Ahlers never got it. On July 21, two books were held for review. On July 22, Thompson withheld brochures from the Medford, Oregon Chamber of Commerce. Ahlers never received them.

**Dismissal of the Complaint.** The district court construed the complaint to raise allegations under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112-12117 ("ADA"), and 42 U.S.C. §§ 1983, 1985, and 1986 for violations of the First and Fourth Amendments. The court concluded that Ahlers failed to state an ADA claim because he had not alleged an impairment that "substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A); that he failed to state claims under § 1985 and § 1986 because he had not alleged that he was deprived of rights on account of his membership in a protected class; that he failed to state a Fourth Amendment claim because the "Defendants seized [his] property to promote the safety and welfare of the [Center's] staff and patients"; and that he failed to state a First Amendment claim because "the Defendants had a legitimate penological interest in monitoring, screening, and withholding [his] property." Ahlers v. Rabinowitz, No. 08 Civ. 11091 (PAC)(KNF), 2010 WL 808773 (S.D.N.Y. Mar. 9, 2010).

Ahlers appeals the dismissal of his § 1983 claims for First and Fourth Amendment violations and argues that the

district court failed to consider his procedural due process claim.[2]

**DISCUSSION**

"We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 570 (2007)).

---

[2] Ahlers does not appeal the district court's dismissal of his ADA, § 1985, and § 1986 claims. Issues related to Ahlers's civil commitment were litigated in several separate actions, and we do not revisit them here. See, e.g., Ahlers v. Spitzer, No. 09 Civ. 10006(SAS), 2010 WL 2545962 (S.D.N.Y. June 24, 2010), aff'd, 432 F. App'x 42 (2d Cir. Sept. 27, 2011); Ahlers v. Boruch, No. 04 CV 1747 (JG), 2007 WL 2042794 (E.D.N.Y. July 16, 2007).

9

"A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citation omitted) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). "This is particularly so when the pro se plaintiff alleges that h[is] civil rights have been violated." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008).[3]

"In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right." Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986). In sum, Ahlers has not pleaded sufficient facts to support a claim that the seizure and withholding of his CDs, DVDs and mail deprived him of First and Fourth Amendment rights, as incorporated through the Fourteenth Amendment, or of his right under the Fourteenth Amendment to procedural due process.

---

[3] Ahlers litigated this case pro se. When Ahlers appealed the judgment of the district court, he petitioned this Court to appoint counsel, which we did on October 13, 2010. We thank appointed counsel for their dedicated and skillful advocacy in this matter.

**I**

To determine the substantive rights of a person involuntarily committed to a state institution, the interests of the individual are balanced against the interests of the state. Youngberg v. Romeo, 457 U.S. 307, 320 (1982); see Buthy v. Comm'r of the Office of Mental Health, 818 F.2d 1046, 1050 (2d Cir. 1987) (balancing to determine the due process rights of persons committed after acquittal by reason of insanity); United States v. Cohen, 796 F.2d 20, 23-24 (2d Cir. 1986) (balancing to determine the Fourth Amendment rights of pretrial detainees). We have not previously undertaken to perform that analysis with regard to the Fourth Amendment right of civilly committed persons to be free from unreasonable searches and seizures.

In a prison or institution housing pretrial detainees, the "essential" state interests include "maintaining institutional security and preserving internal order." Bell v. Wolfish, 441 U.S. 520, 546 (1979). "[O]fficials must be free to take appropriate action to ensure the safety of inmates and . . . personnel and to prevent escape or unauthorized entry." Id. at 547.

11

On the other hand, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg, 457 U.S. at 321-22. However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment. See Aiken v. Nixon, 236 F. Supp. 2d 211, 232 (N.D.N.Y. 2002) (noting the "societal interest in protecting the health, safety, and welfare of the patients and staff" in a state psychiatric center); see also Bell, 441 U.S. at 540 ("The Government . . . has legitimate interests that stem from its need to manage the facility in which the individual is detained [pretrial].").

The state also has an interest in treating the civilly committed individual. "[T]he dual goals of involuntary commitment [are] to provide care and treatment to those unable to care for themselves and to protect the individual and society from those who pose a danger to themselves and others because of mental illness." Goetz v. Crosson, 967 F.2d 29, 34 (2d Cir. 1992); see also McKune v. Lile, 536 U.S. 24, 33 (2002) ("States . . . have a vital interest in rehabilitating convicted sex offenders.").

12

The reasonableness of the seizure in this case depends on a balance of interests: the state's interests in order, security, and treatment, and Ahlers's property interest in his discs.[4] In striking the appropriate balance, decisions made by the Defendants are entitled to a "'presumption of correctness.'" Buthy, 818 F.2d at 1050 (quoting Youngberg, 457 U.S. at 324); see also Youngberg, 457 U.S. at 323 n.30, 324-25 ("The administrators, and particularly professional personnel [i.e., persons competent by education, training or experience], should not be required to make each decision in the shadow of an action for damages.").

Ahlers does not claim entitlement to possess sexually explicit media; his allegation is that none of the discs is sexually explicit. But the Defendants are not bound to accept his characterizations or assurances. It was therefore not unreasonable to seize the discs to look for prohibited material. The fact that the Center allowed Ahlers to acquire the discs did not diminish its interest in ensuring that they were appropriate.

---

[4] Ahlers does not challenge the search of his room--only the seizure of his property--so we need not determine whether he had a privacy interest. Cf. Hudson v. Palmer, 468 U.S. 517, 522-30 (1984) (holding *prisoners* do not have a privacy interest in their cells).

13

Ahlers challenges the motivations of the Defendants in seizing his property and the length of the seizure. But "the subjective motivations of the individual officers . . . has no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 397 (1989), and where, as here, "an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure," Shaul v. Cherry Valley-Springfield Cent. Sch. Dist., 363 F.3d 177, 187 (2d Cir. 2004). "To the extent the Constitution affords . . . any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." Id.

**II**

In alleging a violation of his procedural due process rights, a plaintiff must plead facts sufficient to give rise to a claim that he was deprived of his property without "constitutionally adequate pre- or post-deprivation process." N.Y. State Nat'l Org. for Women v. Pataki, 261 F.3d 156, 163 (2d Cir. 2001). A court must balance three

14

factors in determining what process is due:

> (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

McMenemy v. City of Rochester, 241 F.3d 279, 288 (2d Cir. 2001) (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

Ahlers's allegations are insufficient to support a claim that the Center's pre-deprivation procedures were constitutionally inadequate.

Ahlers alleges that his discs were seized without prior notice. Pretrial detainees are not entitled to notice before a search of their cells. See Block v. Rutherford, 468 U.S. 576, 590, 591 n.12 (1984). The private interest may be greater for civilly committed persons, see Youngberg, 457 U.S. at 321-22; but the state's interest in seizing

15

contraband is no less, and the self-defeating effect of advance notice would be the same. A random search "'allows . . . flexibility and prevents inmates from anticipating, and thereby thwarting, a search for contraband.'" Hudson, 468 U.S. at 529 (quoting Marrero v. Commonwealth, 284 S.E.2d 809, 811 (Va. 1981)).

Ahlers complains that at the time of the seizure, the Center staff did not tell him what they were screening for and gave him no receipt. The state's interest in quick and efficient searches militates against requiring that a detailed explanation or a written receipt be given at the time of seizure. Cf. Block, 468 U.S. at 589-91 (holding searches of pretrial detainees' cells are constitutional even when the detainees are absent during the searches). After the seizure, Ahlers was given a receipt, and informed of the reason for the screening. Ahlers alleges that the staff used different terms to describe the prohibitions-- explicit sexuality, pornography, nudity, clinically inappropriate material--but each term had similar import.

Ahlers alleges that the seizure was unguided by any "written facility policy" or "written authorization." In any context, "[a] requirement that . . . random searches be

16

conducted pursuant to an established plan would seriously undermine the effectiveness of this [measure]." Hudson, 468 U.S. at 529. In the therapeutic context, where "[a] single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day," Youngberg, 457 U.S. at 324, it is particularly hard to catalog contraband. Disorders differ; treatments are individual and subject to change; and deviant interests will render otherwise-benign images clinically inappropriate. Accordingly, the state's interest in the staff's ability to effectively perform their jobs outweighs the value of any additional protection to Ahlers's property interests that would result from a written policy or formula.

Ahlers protests that his property was held for an unreasonably long period. But vetting the CDs and DVDs presumably entails real-time review, conducted by staff with other responsibilities as well. Considering that nearly 250 discs were seized from Ahlers alone, that discs were seized from other patients as well, and that the process is not necessarily of the first priority within the institution, the months taken to complete the work does not suggest that

17

the procedures or policies were constitutionally inadequate.[5]

Ahlers alleges that the 14 DVDs that were permanently confiscated are not sexually explicit. But the Center may consider that there is a broader category of material that is clinically inappropriate without presenting itself as sexual. In any event, Ahlers's disagreement with the Defendants' decision is insufficient to state a claim that the state's decision-making procedures were inadequate.

Ahlers recites a list of encounters with staff, evidently to show that he was afforded inadequate post-deprivation procedures. Thus he alleges that two weeks after the seizure, he was "called into a meeting" with his parole officer and Deatras, Thompson, and Moe; and that approximately five weeks after the seizure, he "was called into a meeting" with the Center's Deputy Director. The complaint does not make clear whether the meetings were opportunities to challenge the deprivation, or whether they were therapeutic, or both. Similarly, the complaint does

---

[5] It is unclear how long Ahlers was deprived of the discs. The complaint indicates that of the 163 DVDs and 86 CDs that were seized, 14 DVDs were permanently confiscated, and 61 DVDs were returned. The complaint does not indicate what happened to the CDs or to the other 88 DVDs.

18

not make clear whether Ahlers's meeting with a lawyer from "Mental Health Services" and the letter Ahlers sent to Rabinowitz were part of a formal or informal appeals procedure, or afforded that opportunity in effect. Because Ahlers has not alleged whether formal post-deprivation procedures were available to him, he has not stated a claim that they were insufficient. See Marino v. Ameruso, 837 F.2d 45, 47 (2d Cir. 1988) ("Absent a showing of inadequate state procedures [the plaintiff's] claim must fail.").[6]

                                 **III**

This Circuit has not articulated the standard by which to analyze censorship of mail in the civil commitment context. "Restrictions on prisoners' mail are justified only if they 'further[] one or more of the substantial governmental interests of security, order, and rehabilitation . . .[and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (alterations in original) (quoting

---

[6] The government has not argued for the applicability of Hellenic Am. Neighborhood Action Comm. v. City of N.Y., 101 F.3d 877 (2d Cir. 1996), so we need not address it.

19

*Washington*, 782 F.2d at 1139). With regard to *legal* mail, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" <u>Id.</u> (citations omitted) (quoting <u>Cancel v. Goord</u>, No. 00 CIV 2042 LMM, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001)). In the context of civil commitment, this formula is easily adapted. A patient must show regular and unjustifiable interference with incoming legal mail; the actions of facility staff in restricting civilly committed individuals' access to legal mail are justified if they advance or protect the state's interest in security, order, or treatment and the restrictions imposed are no greater than necessary to advance the governmental interest involved.

Interference with non-legal mail, as Ahlers claims, is more readily justifiable than interference with so-called legal mail. <u>See</u> <u>id.</u> at 351 ("In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail . . . ."). We need not articulate

20

the correct standard here, however, because Ahlers's complaint cannot support a claim that any alleged "interference" with his non-legal mail was "regular[]" or "unjustifiabl[e]." See id.

Broadly construed, the complaint alleges eleven instances of interference, between March and July 2008.[7] Three times, the withheld items were returned: the GPO catalog was returned within six weeks; the Smithsonian magazine (after Ahlers consented to the removal of its cover) was returned after two weeks; and the package withheld on April 28 was returned the next day. Several brief delays do not amount to a First Amendment violation. See Rowe v. Shake, 196 F.3d 778, 780, 782 (7th Cir. 1999) (holding an allegation that, over the course of three months, eight items took more than fourteen days to reach a prisoner was insufficient); Cancel v. Goord, No. 00 CIV. 2042 (LMM), 2002 WL 171698, at *3 (S.D.N.Y. Feb. 4, 2002) (holding an allegation of seven delays, ranging from two to six weeks, over the course of a year was insufficient).

_____

[7] This total does not include Ahlers's allegation that on May 5, Moe chose not to withhold a DVD catalog after Ahlers objected.

Ahlers alleges three instances involving mail that was never returned, and an additional five instances in which he leaves unspecified whether the seized mail was ever returned to him.  The brochures from Klamath Falls were withheld because they contained images of children in bathing suits, which staff deemed clinically inappropriate.  Because of the state's interest in treating Ahlers's sexual deviance, Center staff had a justification for an embargo on these images.  See Yeldon v. Hogan, No. 9:08-CV-769 (NAM/RFT), 2010 WL 983819, at *9 (N.D.N.Y. Mar. 15, 2010) ("Restrictions on incoming mail containing pictures of minors [in an institution of civil commitment] where many residents have committed sexual offenses against children is a policy that is rationally related to legitimate government interests.").

The reasons for some of the other withholdings are unclear.  The complaint says very little about the "publication" withheld on March 21, 2008, or the brochures from Medford, or the material withheld on April 28, April 29, July 11 and July 21.

In any event, eleven instances over four months does not in itself support an inference of *regular* interference.

22

And the allegation that mail was withheld is insufficient to support a claim that it was withheld *unjustifiably*.[8]

The foregoing analysis is directed to Ahlers's complaint that his mail was intercepted and withheld arbitrarily, and that the Defendants' actions were not governed by any rule or policy.  We therefore must proceed on the assumption that no rule or policy exists.  In so doing, we recognize that the test for ascertaining the constitutional validity of such a rule is established in

---

[8] The complaint also fails to state Fourth Amendment and procedural due process claims with regard to the withholding of mail.  Ahlers's property interest in mail-order catalogs and similar materials borders on de minimis.  See Buthy, 818 F.2d at 1050; see also Nickens v. White, 536 F.2d 802, 803 (8th Cir. 1976) (per curiam) (holding a prisoner's interest in a catalog was de minimis).

In any event, the state's interest in preventing Ahlers from obtaining clinically inappropriate images is strong, and Ahlers's interest in incoming commercial mail is relatively weak.  The Defendants' seizure of such mail for screening was not unreasonable.  See United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998) ("[T]he interception of a defendant's prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail.").  Ahlers has not sufficiently alleged that the Center's procedures were constitutionally inadequate because Ahlers has not alleged what (if any) procedures were available.  Cf. Procunier v. Martinez, 416 U.S. 396, 417 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 417 (1989) ("[T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards.").

23

Turner v. Safley, 482 U.S. 78 (1987).  As we have explained:

In Turner, the Supreme Court instructed that courts reviewing the validity of prison regulations should apply several factors.  First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates."  Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  Finally, courts should consider the challenged regulation in relation to proposed alternatives.

Johnson v. Goord, 445 F.3d 532, 535 (2d Cir. 2006) (citations omitted) (internal quotation marks omitted) (quoting Turner, 482 U.S. at 89-90).  These four considerations amount to an overall test of reasonableness that differs from the test applied here more in its procedure than in its substantive outcome.  See Turner, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates'

24

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. . . . [S]everal factors are relevant in determining the reasonableness of the regulation at issue.").

**IV**

We have for the first time undertaken a Fourth Amendment balancing analysis with regard to the right of a civilly committed person to be free from unreasonable seizures. In other circumstances, that might justify a remand for a pro se complainant to replead. See Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795-96 (2d Cir. 1999) ("[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.") (internal quotation marks omitted). However, we are satisfied that, in any event, "it was objectively reasonable for [the Defendants] to believe their acts did not violate" Ahlers's Fourth Amendment rights, or his First Amendment or procedural due process rights. See Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996).

25

"The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively reasonable . . . ." Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998). The complaint requests relief of "one thousand dollars ($1,000.00) per day punitive damages" from the date Ahlers's property was seized until the date it "is returned to him intact." This demand for money damages might also be read as a prayer for injunctive relief. However, Ahlers, though pro se, knew how to plead a claim for injunctive relief, and did, albeit as to a matter now moot.[9] More importantly, Ahlers's brief, filed by counsel, does not argue for an injunction. Moreover, although the parties' briefs argue back and forth on the issue of qualified immunity, Ahlers does not contend that his prayer for relief was anything but a claim for money damages. "Issues not sufficiently argued in the briefs are considered waived and normally will not be

---

[9] The complaint requests that the court "issue an order, directing that defendants . . . be stayed and prohibited from taking any action including . . . harassment and bullying, relating to defendant[s'] actions complained of in the instant proceeding." Ahlers has since relinquished this claim as moot because in 2009, he was transferred from the Center to the Central New York Psychiatric Center.

26

addressed on appeal." <u>Norton v. Sam's Club</u>, 145 F.3d 114, 117 (2d Cir. 1998). Accordingly, we construe the complaint as a claim for money damages and conclude that the Defendants are entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of dismissal.

27